## BOWLES v. SUPERIOR PACKING CO.
### Civ. No. 672.

District Court, D. Minnesota, Third Division.

July 16, 1945.

Harris J. Nuernberg, District Enforcement Attorney, and Amherst Tautges, Enforcement Attorney, Office of Price Administration, both of St. Paul, Minn., for plaintiff.

Richard S. Felhaber, of St. Paul, Minn., for defendant.

NORDBYE, District Judge.

The defendant maintains and operates a beef slaughter house and plant at St. Paul,

Minnesota. It does not can, cure, or process meat. Its chief market is to customers in Boston, Washington, and other large cities in the East. All of the meat sold in the East is shipped in refrigerator cars which usually will hold about 25,000 pounds. Meat packed in boxes and barrels and shipped in refrigerator cars will weigh much more. The alleged violation of the so-called carload discount regulations took place between October 6, 1943, and October 4, 1944. The shipments concerned carloads of meat weighing more than 15,000 pounds. The carloads were destined for more than one customer. However, the car would be consigned to one customer at one railroad delivery point and the contents would be invoiced to two or more customers. The practice was for the consignee to notify the other customers of the arrival of the car. Each customer would thereupon pick up the portion of the carload invoiced to it and make its own arrangements for the transportation of its share of the carload to its respective place of business. It should be made clear that the defendant paid the freight on the car to the single delivery point and each buyer paid the transportation cost from such point to its place of business. The carload sales handled in this manner may, for convenience, be referred to as the Boston method. The Washington method will hereafter be commented upon.

The plaintiff contends that the Boston method required the deduction of 25 cents per hundredweight from the purchase price for the meat sold to each customer regardless of whether the portion of the carload shipment to the particular customer was less than or in excess of 15,000 pounds. Plaintiff contends that a total of 10,218,732 pounds of beef carcasses, etc., subject to Revised Maximum Price Regulation No. 169, and 1,442,757 pounds of variety meats and edible by-products, subject to Maximum Price Regulation No. 398, were shipped under the so-called Boston method and were therefore subject to the carload discount. The provision of the regulations pertaining to carload discounts under Revised Maximum Price Regulation No. 169, as found in Section 1364.453(b), reads: "Carload discount. For all beef carcasses and/or beef wholesale cuts and/or other meat items subject to this subpart B and Sec. 1364.453 and Sec. 1364.454, delivered in a straight or mixed carload shipment or sold as a part of a straight or mixed car-

load sale, the seller shall deduct 25 cents per hundredweight from the applicable zone price."

The definition of a carload under this regulation is found in Section 1364.455(a) (2), which reads:

" 'Carload' means:

"(i) A shipment by rail of fresh or frozen wholesale meat cuts, and/or cured meat cuts, meat or processed products and/or carcasses, or any combination of the foregoing to a single delivery point, of at least the minimum weight upon which the railroad carload rate from the point of shipment to the delivery point, as evidenced by the tariffs of railroad carriers, is based. Provided, that where the transportation charge for shipment of a lesser weight at the railroad carload rate would be lower than the transportation charge for such a shipment at the railroad less-than-carload rate, such lesser weight shall be considered a carload;

"(ii) A shipment by motor truck or trucks to a single delivery point of 15,000 pounds or more of fresh or frozen wholesale meat cuts and/or cured meat cuts, meat or processed products and/or carcasses, or any combination of the foregoing, as a single bulk sale transaction; and

"(iii) Any single bulk sale transaction wherein the buyer takes delivery at the seller's place of business of 15,000 pounds or more of fresh or frozen wholesale meat cuts and/or cured meat cuts, meat or processed products and/or carcasses, or any combination of the foregoing."

Paragraph (i) is pertinent here.

It seems clear that the sales in question involved shipment by rail in carload quantities consigned to one buyer to a single delivery point. The shipments were accorded the transportation rate under the railroad tariff which was lower than the transportation rate would have been at less-than-carload rates. If the consignee had been the only purchaser of the entire carload, no question would have arisen as to the requirement of the discount of 25 cents per hundredweight in order to comply with the maximum price regulation applicable to the zone in which the meat was sold. Moreover, it would seem that there can be no question as to the mandatory provision of the regulation requiring a 25 cents per hundredweight discount on all sales under this method where the delivery to any one customer aggregated 15,000 pounds or more.

The more difficult question arises as to the applicability of the regulation to sales to any individual customer under the so-called Boston method where the meat delivered was less than 15,000 pounds.

■ A consideration of the regulations themselves would seem to permit no other construction than that advanced by the plaintiff. Every essential element contained in the definition of a carload set forth under Section 1364.455(a) (2) is met by the admitted facts herein. It would seem, therefore, that the allocation of the contents of the car by the consignee in accordance with the carload invoice would not prevent the mandatory discount provisions from becoming effective. In other words, an analysis of the facts establishes that the particular meat was shipped by rail in carload quantities to a single delivery point to a single consignee at a rate which was less than the transportation for such shipment at the railroad less-than-carload rate. Some confusion, however, or at least room for argument, has arisen on account of the language used in the Statement of Considerations under the heading "Carload Discount." Paragraph G. 1. thereof reads as follows: "Provisions have been made in the regulation to allow for adjustment in price to cover extra costs involved. On the same basis a reduction in the price must be made where certain costs are not incurred. The base price in the regulation has been established for less-than-carload lots, whereas it costs less to sell in larger quantities. Recognizing this, the specified maximum prices are reduced 25 cents per hundredweight where 15,000 pounds or more of beef or mixed meats are delivered to a single destination in a carload shipment. This reduction roughly reflects the savings in handling and selling costs which are affected when a single buyer takes one delivery of a volume this large."

■ The last sentence would indicate that it was assumed that carload discounts would apply only to a single buyer taking 15,000 pounds or more of beef or mixed meats in a carload shipment. But, on the other hand, it seems evident, in light of the Statement of Considerations, that the basis for the discount was predicated on the savings which would follow to the seller by reason of the carload transportation rate. This, of course, was obtained by the defendant in the sale of meats in carload lots of more than 15,000 pounds delivered to a single destination. The fact that more than one buyer might ultimately receive the contents of the car in lots less than 15,000 pounds would not lessen the benefits which the seller would receive from the carload transportation rate. The illustration of a single buyer in the Statement of Considerations does not necessarily negative the application of the regulation providing for the discount of 25 cents per hundredweight where a carload of meat was shipped to a single delivery point and consigned to one person although the contents were invoiced to two or more persons. Certainly, the language used in the Statement of Considerations does not purport to limit the application of the regulations to the illustration cited. It may be true that, in many instances, a carload of meat weighing more than 15,000 pounds would be sold to a single purchaser and the illustration may be apt for that reason. In any event, this Court has no other duty but to interpret and apply the regulations, for the regulations, and not the Statement of Considerations, are controlling.

Reference is made by the defendant to the custom and practice followed by it in providing for carload shipments of meats to eastern cities other than the ones referred to in the bill of complaint, and it compares such practices, which are approved by the Office of Price Administration, with the ones which are the subject of this bill of complaint. It refers to the system or method which has been followed in shipping carloads of meat to Washington, D. C., and other eastern points, where the practice has been for the defendant to consign the car to itself or its agent. It is this method or practice which may be referred to as the Washington method. Under this practice, the defendant arranges for and pays the separate delivery charge to the stores or places of business of the buyers of the carloads in lots less than 15,000 pounds. The Office of Price Administration has apparently ruled that such carload sales are not subject to the 25 cents per hundredweight discount. In addition, the Office of Price Administration has ruled that, not only may the defendant charge the zone price without deducting the 25 cents per hundredweight discount, but may charge a 25 cent delivery charge. Under the so-called Washington method, a larger return is accorded the seller than under the Boston method, which is the subject of this bill of complaint.

Consequently, even though the defendant failed to accord the purchasers the carload discount under the Boston method, notwithstanding such failure it resulted in a lower price to the purchaser than if the defendant had followed the method which the Office of Price Administration now approves. The defendant, therefore, pointedly asks how the Boston method can be stamped as inflationary if it results in a lower price to the buyer as compared to the approved Washington practice.

While the situation may present an anomaly in light of the purposes of price control, it would seem that this Court is without authority to correct the matter. The validity of the regulations is a matter entirely within the jurisdiction of the Emergency Court of Appeals. Moreover, seeming inconsistencies and impractical results in the comprehensive field of price fixing may appear without the particular regulation being invalid. In any event, this Court is not empowered to tinker with the intricate structure devised for the purpose of controlling inflation. It may not be amiss to point out, however, that, under the so-called Washington method, the seller is responsible for the entire shipment until it reaches the buyer's hands. It has to supervise the transportation from the single delivery point to the buyer's place of business, and the title to the carload products remains in the seller when it reaches its destination and until it is deposited at the buyer's place of business. Under these circumstances, it would seem reasonable to conclude that such a practice does not constitute a carload sale to certain buyers at a single point of delivery. Rather, it may be likened to the delivery of meat from the seller's own place of business. See Section 1364.455(a) (2) (iii) recited above. But whether or not the interpretation given by the Office of Price Administration is sound or otherwise, the applicability of the appropriate regulations to the so-called Boston method of carload sales will permit no other conclusion than that the defendant has violated the regulations referred to in failing to accord the buyers the 25 cents per hundredweight discount.

The views expressed above are likewise applicable to the items of mixed meats subject to Maximum Price Regulation No. 398. 1,442,757 pounds of these items were sold and delivered. The meats were shipped with beef and beef carcasses subject to Revised Maximum Price Regulation No. 169 in carload lots containing more than 15,000 pounds shipped to one person at one single delivery point. The buyers to whom such sales were billed picked up the meat at such delivery point and arranged for their own transportation. Section 15 (b) of Maximum Price Regulation No. 398 reads: "Carload discount. For all variety meats and edible by-products delivered in a straight or mixed carload shipment or sold as a part of a straight or mixed carload sale, the seller shall deduct 25 cents per hundredweight from the applicable zone price."

It may be pointed out in passing that there is nothing in the Statement of Considerations for this regulation which uses an illustration such as is found in the last sentence of the Statement of Considerations pertaining to Revised Maximum Price Regulation No. 169.

Reference is made to Section 3(e) of the Act, 50 U.S.C.A.Appendix, § 903(e), which states: "Notwithstanding any other provision of this or any other law, no action shall be taken under this Act by the Administrator or any other person with respect to any agricultural commodity without the prior approval of the Secretary of Agriculture; * * *."

It is conceded that the plaintiff did not obtain the approval of the Secretary of Agriculture prior to the issuance of Revised Maximum Price Regulation No. 169 and Maximum Price Regulation No. 398. But it would seem that an impelling answer to defendant's contention that these regulations were void without the Secretary's approval is to be found in the very language of the sections referred to. Section 3(e) of the Act refers to agricultural commodities, not to commodities processed or manufactured in whole or in part from agricultural commodities. The fact that defendant is referred to as a non-processor in the particular trade in which it is engaged does not militate against the plaintiff's contention that it is nevertheless selling meats which are processed or manufactured from agricultural commodities, rather than selling agricultural commodities. The slaughter and preparation of animals for human consumption is patent evidence in support of plaintiff's construction. Moreover, it may be pointed out that the Administrator considers meats and meat products as processed agricultural commodities. This appears from the preamble of Revised

Maximum Price Regulation No. 169, which was promulgated in light of the requirements of Section 3(c) of the Act. Section 3(c) reads: "No maximum price shall be established or maintained for any commodity processed or manufactured in whole or substantial part from any agricultural commodity below a price which will reflect to producers of such agricultural commodity a price for such agricultural commodity equal to the highest price therefor specified in subsection (a)."

In the preamble to Revised Maximum Price Regulation No. 169 will be found the following statement: "The maximum prices established herein are not below prices which will reflect to producers of the agricultural commodities from which beef and veal carcasses and wholesale cuts and processed products are produced a price for their products equal to the highest of the prices required by the provisions of the Emergency Price Control Act of 1942, as amended [50 U.S.C.A.Appendix, § 901 et seq.], and by the Executive Order of October 3, 1942 [No. 9250, 50 U.S.C.A.Appendix, § 901 note]."

At least, this preamble would suggest that the Administrator had concluded that meat and meat products are processed from agricultural commodities and are not agricultural commodities themselves. As to the question of the authority of this Court to determine whether or not the meats herein are agricultural commodities or processed from agricultural commodities in determining the validity of the Office of Price Administration regulation, see Bowles v. American Brewery, Inc., 4 Cir., 146 F.2d 842, and Rosensweig v. United States, 9 Cir., 144 F.2d 30.

▮▮ This brings us to the question as to the amount of recovery to which plaintiff is entitled. The burden of proof rests upon the defendant to establish that the violations were not willful and were not the result of its failure to take practical precautions against them. Clearly, the evidence will not justify a finding that defendant's violations were willful. The defendant's good faith is not seriously questioned. In order to determine whether the violations were the result of its failure to take practical precautions against their occurrence, distinction must be made as to the factual situation pertaining to the conceded violation growing out of the delivery charges made by the defendant for local delivery of boneless beef, and the facts and circum-stances which exist regarding the carload discounts. As to the erroneous delivery charge items, it appears that defendant was advised by the Office of Price Administration of the correct interpretation of the appropriate regulation in February, 1943. Defendant instructed its employees to eliminate all such delivery charges, and from time to time checks were made by it of the invoices to determine whether or not any such erroneous charges had been made by its employees. It is not doubted that the defendant endeavored in good faith to rectify the practice which had been followed in this regard. But it is plaintiff's position that the delivery overcharges resulted because of an inadequate system of checking the work of defendant's employees and safeguarding by proper business methods against such improper charges. All of the delivery overcharges which are the subject of this action took place after February, 1943, when the defendant was warned that the charges were improper. In light, therefore, of the admitted facts, it would seem that there was a looseness in defendant's business methods which could have been avoided, and it does not appear that any unreasonable burden would have been placed upon the defendant in avoiding the imposition and collection of these erroneous charges. It would seem that reasonable care would have avoided their collection. At least, it has failed to sustain the burden of proof which rests on it in this regard. After due consideration, it is the Court's view that damages should be assessed in an amount representing one and one-half times the conceded delivery overcharges.

However, with regard to the carload discounts, it would not seem that the Court would be justified in finding that the defendant has failed to sustain the burden in establishing that the violations were not the result of its failure to take practical precautions against their occurrence. For some years prior to the adoption of the Office of Price Administration regulations, the defendant had adopted one method in handling its carload sales in the City of Washington and other eastern cities, and another method in Boston and several other eastern points. It is clear that it as-sumed that both methods or practices of handling carload shipments did not require the 25 cents per hundredweight discount on sales made to either point under the circum-stances. This view was in accord with the

interpretation that others in the trade had given to the pertinent regulations which are now under consideration. The language of the Statement of Considerations covering Maximum Price Regulation No. 169 was apparently relied upon. It was not until September, 1944, that the defendant learned from the officials of the Office of Price Administration that, under one method, it was violating the law, and under the other method the regulations were not being contravened. It must be recognized that the regulations are at least somewhat involved and laymen could well err in unwittingly violating them even though they took practical precautions against such violations. As an indication of the defendant's good faith, it may be pointed out that the Washington method of carload sales, which the Office of Price Administration has approved, results in a larger return to the seller. Since September, 1944, the defendant has adopted the so-called Washington method in handling all of its carload sales to eastern points and has obtained a larger return than under the Boston method. While the term "practical precautions against violations" is not susceptible of a hard and fast interpretation, it may be stated that it fairly encompasses the type of precaution which should be maintained by a reasonably prudent business man to safeguard his business against price violations. Using such a standard or yardstick, it does not necessarily follow that every business institution must hire a lawyer to render a legal opinion on every regulation which may be applicable to its business. When it is observed that competitors are following a certain business practice, which is apparently in keeping with Office of Price Administration regulations, it is not surprising that a relatively small concern like the defendant would conclude that such practices were in keeping with the spirit as well as the letter of the law. Moreover, it might be pointed out in passing that the Office of Price Administration inspectors visited defendant's plant early in 1943. They were there about a week and no reference was made to the carload discount violation, although defendant was carrying on its carload deliveries under both the Washington and Boston methods at that time. In any event, it seems to the Court that it should give the defendant the benefit of any doubt in the matter and con-

clude that it had fairly sustained the burden of proof with respect to its lack of willfulness, and also that it did not fail to exercise reasonable precautions to prevent the violations. It follows, therefore, that, in so far as the carload discount violations are concerned, the judgment to which plaintiff is entitled should not exceed the amount of overcharges.

■■■ The defendant refers to the case of Heinz v. Bowles, 149 F.2d 277, which was decided by the Emergency Court of Appeals, and where the court ordered a judgment setting aside Revised Maximum Price Regulation No. 169 in so far as the maximum prices therein for beef carcasses and wholesale cuts are applicable to nonprocessing slaughterers, as defined in the directive of October 26, 1943. However, there was also presented to this Court an order of the Emergency Court of Appeals dated April 2, 1945, whereby that court ordered that the judgment in the Heinz case be vacated and leave was granted to either party to furnish additional evidence bearing on the validity of the regulation. It would seem, therefore, that by reason of the court's order of April 2, 1945, the judgment setting aside Revised Maximum Price Regulation No. 169 has been vacated, and, until further order of that court, this Court cannot indulge in any assumptions as to the ultimate disposition which may be made of the issues in the Heinz case.[1] But if the defendant desires to avail itself of any attack that may be made upon the legality of the regulation referred to, Section 204(e) of the Act, 50 U.S.C.A.Appendix, § 924(e), provides that, within five days after judgment in any civil proceeding brought pursuant to Section 205, 50 U.S.C.A.Appendix, § 925, the defendant may apply to the court in which the proceeding is pending for leave to file in the Emergency Court of Appeals a complaint against the Administrator setting forth the objections to the validity of any provision which the defendant is alleged to have violated. Under this section of the Act, it would seem that the defendant is accorded an opportunity to request leave of court to avail itself of any further proceedings which it may desire to initiate with reference to the legality of any regulation herein which may have been promulgated by the Administrator. It may be emphasized

---

[1] Since this opinion was filed, the Emergency Court of Appeals has re-decided the Heinz case and held the regulation valid. See Bowles v. Heinz, 1945, 150 F.2d 456.

again, however, that this Court is only empowered to grant a stay in the present proceeding after judgment, upon applications made within five days after the judgment is rendered and upon the showing that the statute prescribes.

From the foregoing, it follows, therefore, that between October 6, 1943, and October 4, 1944, defendant sold and delivered 10,218,732 pounds of beef carcasses, beef wholesale cuts, and other meat items, and demanded and received for such sales and deliveries prices which failed to accord to the buyer the 25 cents per hundredweight discount, and which therefore resulted in an excess selling price over the maximum price permitted by Revised Maximum Price Regulation No. 169 in the sum of $25,546.83; that between October 8, 1943, and September 11, 1944, by reason of the conceded violation of Revised Maximum Price Regulation No. 169 in charging and collecting certain delivery charges on the sale of 176,200 pounds of boneless beef, etc., the defendant has received prices for such sales which exceeded the maximum prices permitted therefor by said regulation in the sum of $440.50; and that on and between October 6, 1943, and October 4, 1944, defendant violated Maximum Price Regulation No. 398 by selling and delivering 1,442,757 pounds of fresh and processed variety meat and edible by-products and demanding and receiving for such sales and deliveries certain prices which did not accord the buyer his carload discount of 25 cents per hundredweight as provided by such regulation, and has thereby demanded and received prices for such sales exceeding the maximum prices permitted by Maximum Price Regulation No. 398 in the sum of $3,606.89.

Plaintiff is entitled to judgment, therefore, against the defendant in the sum of $25,546.83, $660.75 (one and one-half times the conceded overcharge of $440.50), and $3,606.89, or a total of $29,814.47. Furthermore, the plaintiff is entitled to judgment against the defendant for a permanent injunction enjoining the defendant and its agents, servants, and employees, from selling and delivering, or offering to sell and deliver, meats in excess of the maximum prices permitted therefor by Revised Maximum Price Regulation No. 169 and Maximum Price Regulation No. 398.

An exception is allowed to the defendant.

Findings of fact and conclusions of law in harmony herewith may be presented by the plaintiff upon five days' notice.