**BOWLES, Price Administrator, v. ARCADE INV. CO.**

Civil Action No. 841.

District Court, D. Minnesota,
Third Division.

March 9, 1946.

Harris J. Nuernberg, Dist. Enforcement Atty., John Sturner, Enforcement Atty., and Lowell J. Grady, Litigation Atty., all of the Office of Price Administration, all of St. Paul, Minn., for plaintiff.

Richard S. Felhaber and Gustav A. Larson, both of St. Paul, Minn., for defendant.

DONOVAN, District Judge.

Plaintiff commenced action under the Emergency Price Control Act of 1942, as amended, 56 Stat. 23 et seq., 50 U.S.C.A. Appendix §§ 901–946, 961–971, 925, hereinafter referred to as the Act, for statutory penalty and to enjoin sales in excess of maximum price regulations.

A pre-trial conference was had and the facts were stipulated by the parties. The defendant is a private business corporation organized under Minnesota law. Jurisdiction is conceded in all respects.

Defendant owns and operates two separate commercial buildings and the Lowry Garage, all located in the same block, in the City of St. Paul, Minnesota, and in connection with such ownership it operates a central heating plant by which it supplies heat to said buildings, and also to

the Lowry Hotel and St. Paul Building. The last two buildings are not owned by defendant. Steam was furnished the Lowry Hotel and St. Paul Building for their trade and business, under contracts entered into prior to March 1, 1942, providing for a service charge equal to charges made for like service rendered by Northern States Power Company, a public service corporation operating pursuant to franchise granted by said City of St. Paul. Defendant concedes that it does not supply steam to any other customers, and limits its service to the square block containing said buildings. Its rates are not governed by any law, ordinance or public regulation. Defendant does not use streets or other public property and holds no franchise, license or permit of any kind, of a public character, in supplying steam to its purchasers.

Commencing in September, 1942, and periodically thereafter, there was an exchange of letters between plaintiff and defendant, having to do with defendant's status under the Act. Defendant asked for a ruling by plaintiff relative to rates charged by it, and was advised by plaintiff that contracts relied upon for that purpose have "been superseded by the General Maximum Price Regulation * * * It is our opinion that you are now [September 11, 1942] entitled to charge the same contract rate that you were entitled to charge during the month of March," 1942.

On March 9, 1944, defendant addressed a letter to "Transportation and Public Utilities Division, Office of Price Administration, Washington, D. C.," notifying plaintiff of proposed new rates, and adding:

"Each month we may increase this rate * * * We are not a regulated public utility pursuant to specific exemptions in our state and municipal ordinances. However, we do hold ourselves out to perform public utility functions within the limited area of St. Peter Street to Wabasha Street, and Fourth to Fifth Streets in the City of Saint Paul."

Subsequently, defendant made application for adjustment of ceiling prices as provided by Revised Maximum Price Regulation No. 165 on the sale of steam to Dunn Realty Company, located in said area.

During the period July 1, 1944, and January 1, 1945, defendant company, for its service of supplying steam, charged and collected from said purchasers a sum which exceeded by $376.50 the consideration which the defendant would have received had it charged and collected for said services during said period the highest rates charged by the Northern States Power Company during March of 1942, but which was not in excess of the rates filed by defendant with the Transportation and Public Utilities Division of the Office of Price Administration, Washington, D. C.

The regulations pertinent to the facts recited under the Act here controlling (Maximum Price Regulation No. 165, as amended) read as follows:

"§ 1499.101. Prohibition against dealing in services above maximum prices. On and after July 1, 1942, *regardless of any contract* or other obligation:

"(a) Sales. No 'person' shall 'sell' or supply any of the 'services' set forth in paragraph (c) of this section at a price higher than the maximum price permitted by this Maximum Price Regulation No. 165 as amended.

"(b) Purchases. No person in the course of trade or business shall buy or receive any of the services set forth in paragraph (c) of this section at a price higher than the maximum price permitted by this Maximum Price Regulation No. 165 as amended:

\* \* \* \* \*

"(c) Services covered. This Maximum Price Regulation No. 165 as amended shall apply to all rates and charges for the following services, except when such services are rendered as an employee:

\* \* \* \* \*

"(64) Steam—rates charged for (including, but not limited to, steam supplied for heat, power, or hot water), by persons supplying otherwise than as *public utilities*." (Italics supplied.)

Section 302(c) of the Act defines the word "commodity," following which is significantly added:

"Provided. That nothing in this Act shall be construed to authorize the regulation of * * * (2) rates charged by any common carrier or other *public utility* * * *." (Italics supplied).

Incidentally, affecting the situation in the present case is Section 1 of the Stabilization Act of 1942, 50 U.S.C.A.Appendix § 961, which, among other things, provides;

"That no common carrier or other public utility shall make any general increase in its rates or charges which were in effect on September 15, 1942, unless it first gives thirty days notice to the President, or such agency as he may designate, and consents to the timely intervention by such agency before the Federal, State, or municipal authority having jurisdiction to consider such increase."

The issues reduced to simplest terms are these: Is defendant a "public utility" within the meaning of Section 302(c) of the Act? If not a "public utility," then the question of next importance is whether or not defendant violated the Act and Regulations in any respect. If so violated, was such violation willful?

■ Defendant has not supplied, and does not supply, its steam service to any purchaser, other than those located in the square city block wherein its heating plant is situated, although it holds itself out as willing to furnish such service to any and all purchasers in said block. Does this give defendant the necessary color, indicia, or character of a "public utility" as contemplated by the Act and thereby make it exempt from the regulations above quoted? The controlling facts require a negative answer.

■ The Act does not attempt to define "public utility"; hence resort must be had to the decided cases to determine what Congress intended to include in the quoted term. Words undefined in the Act should be interpreted "in their plain, ordinary and popular sense * * * unless it can clearly be seen that Congress used the words in question in a broader or different sense than that which would ordinarily be attributed to them." See Helvering, Commissioner of Internal Revenue, v. Rebsamen Motors, Inc., 8 Cir., 128 F.2d 584, 587.

Consideration has been given to the points and authorities set forth in the defendant's brief. After much study and research by the Court, it seems clear that defendant was not, during the period in question, a "public utility" within the meaning of section 302(c) of the Act.

Was defendant affected with a public interest? Defendant was at no time subjected to regulation as a utility. It is not even suggested that it was traditionally regarded as a utility. The rates charged for the service it rendered its purchasers were not established by law or public regulation. The criterion governing defendant in establishing the rates complained of was the rates charged by the Northern States Power Company, which operated under a franchise granted by the City of St. Paul, and to whom it was answerable as a public service corporation. Not so the defendant, however. Under the theory here advanced, it was responsible to no authority and could grant or deny service as it saw fit.

The Supreme Court of the United States had the problem here presented before it in the case of Davies Warehouse Co. v. Bowles, Price Administrator, 321 U.S. 144, 64 S.Ct. 474, 478, 88 L.Ed. 635. Davies Warehouse Company was a public warehouse in California, the business of which was declared by the Constitution of the State to be a public utility, and as such was subject to comprehensive regulation (including the fixing of rates and charges) under the Public Utilities Act of the State. The Court, declaring Davies Warehouse Company a "public utility" within the meaning of the proviso of section 302(c) of the Act, went on to say:

" * * * the reasonable view appears to be that Congress by the term 'public utilities' exempted those *whose charges already were regulated as public utilities* and hence were not probable sources of inflationary dangers." (Italics supplied.)

In the present case it cannot be said that defendant was even a "conventional utility." It was at no time subject to any state or local regulatory authority.

Defendant not being exempt from regulation under the Act because it was not a "public utility" within the meaning of the proviso of section 302(c), the only remaining questions are whether treble damages should be allowed and defendant enjoined against continued violations.

■ The burden of proof rests upon the defendant to establish that its violations were not willful. Bowles v. Superior Packing Co., D.C., 63 F.Supp. 12. Defendant makes no attack upon the legality of the regulations with which we are here concerned. Its argument is directed at plaintiff's claim that defendant was not exempt from regulation as a "public utility." Plaintiff has challenged defendant's good faith, pointing out violations, in the face of plaintiff's prior advice and warnings,

580

that plaintiff's conduct was contrary to the intent and purpose of the Act.

■ The correspondence between plaintiff and defendant suggests knowledge by plaintiff that it was violating the Act and Regulations referred to and intended to continue its determined assumption that it was a "public utility." Under the facts stipulated to, it seems manifest that the conduct of defendant herein complained of was willful within the definition last quoted.

Any confusion that might be attributed to plaintiff's Regulations and correspondence is at once dispelled by reference to Exhibit 3 of the Stipulation of Facts, where, as early as September 11, 1942, plaintiff advised defendant, among other things, that:

"Insofar as your contract provides for a continuous adjustment upward of your rates in accordance with increases put into effect by the Northern States Power Company subsequent to March, *it has been superseded by the General Maximum Price Regulation.*" (Italics supplied.)

Webster's New International Dictionary, Second Edition, defines the word "willful" to be: "willing; self-determined; voluntary; intentional." Refusal to comply with plaintiff's warning as above outlined makes defendant's violation willing, voluntary and intentional.

Davies Warehouse Co. v. Bowles, supra, is controlling here. Five months before the commencement of the period we are here concerned with, the Court's opinion in that case definitely excluded defendant in the present case from right to exemption, for the obvious reason that defendant's charges were not "regulated" at any time. The claimed "indirect control" of defendant's rates by the City of St. Paul is too remote. If defendant's reasoning was sound, by the same token it could furnish electric current from its own plant to an adjoining building of independent ownership and hold itself out to furnish like service to all others in the block and thereby become a "public utility." The Act's exemption does not extend to such extreme limits.

The circumstances are such in the case at bar that the Court is required to award treble damages to plaintiff. Bowles v. Ammon et al., D.C., 61 F.Supp. 106.

■ The Court has given much thought to the necessity for an injunction as prayed for by plaintiff. At the pre-trial conference, in the Stipulation of Facts which followed, and in the helpful brief of counsel for defendant, the Court was impressed with defendant's expressed willingness to cooperate with plaintiff toward a just determination of the issues involved. Learned counsel has informed the Court in defendant's brief "that an injunction is not needed in this case." Defendant's good faith in suggesting discontinuance of the violations complained of is sufficient basis for the Court's exercise of discretion in denying injunctive relief. Speten v. Bowles, etc., 8 Cir., 146 F.2d 602; The Hecht Co. v. Bowles, etc., 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754.

Plaintiff may have judgment for three times the amount of the overcharges. No injunction will be granted, but an order will be entered retaining the case on the docket with the right of plaintiff or his successor in office, on proper notice, to renew application for injunctive relief, if a violation should recur.

Findings of fact and conclusions of law with an appropriate form of order may be presented by plaintiff upon five days' notice.

An exception is allowed defendant.