149 F.2d 277 (1945)
HEINZ et al.
v.
BOWLES, Price Administrator.[*] E. KAHN'S SONS CO.
v.
SAME.
Nos. 102, 103.
United States Emergency Court of Appeals.
Heard September 21, 1944.
Decided March 29, 1945.
Complainants Petition for Rehearing Denied May 1, 1945.
*278 Wilbur LaRoe, Jr., of Washington, D. C. (Frederick E. Brown and Arthur L. Winn, Jr., both of Washington, D. C., on the brief), for complainants.
Jacob D. Hyman, Chief, Court Review Price Branch, of Washington, D. C. (Richard H. Field, Gen. Counsel, Nathaniel L. Nathanson, Associate Gen. Counsel, Carl H. Fulda, and John J. Downey, Jr., Attys., all of the Office of Price Administration, all of Washington, D. C., on the brief), for respondent.
Before MARIS, Chief Judge, and MAGRUDER and LAWS, Judges.
Heard at Washington September 21, 1944.
MAGRUDER, Judge.
Edward Heinz et al., co-partners doing business as Heinz's Riverside Abattoir, The Koblenzer Company, Reynolds Packing Company, Ben H. Rosenthal & Company, Inc., T. L. Lay Packing Company, and E. Kahn's Sons Company, at various dates between March 25, 1943, and April 10, 1943, filed with the Price Administrator their separate protests against Revised Maximum Price Regulation No. 169  Beef and Veal Carcasses and Wholesale Cuts, issued December 10, 1942, 7 F.R. 10381. The Administrator consolidated these protests with several similar protests of other parties, and after extended proceedings issued an order on October 27, 1943, denying the consolidated protests except to the extent that relief was forthcoming under the subsidy program and cattle stabilization plan instituted pursuant to the Directive of the Office of Economic Stabilization issued October 26, 1943, 8 F.R. 14641.
On November 26, 1943, the first five complainants named above filed their joint complaint in this court (No. 102), and on the same day E. Kahn's Sons Company filed its separate complaint (No. 103). By orders entered January 17, 1944, we granted applications by the complainants in the two cases for leave to introduce additional evidence, such evidence to be presented to the Price Administrator together with such other evidence as the Administrator might deem it proper to receive. The Administrator *279 on February 21, 1944, reopened the protest proceedings for the reception of additional evidence. On April 24, 1944, the Administrator issued an order denying the protests upon reconsideration.
By order dated April 27, 1944, we granted respondent's motion to consolidate Nos. 102 and 103 for hearing and disposition. Subsequently, pursuant to leave granted, respondent and complainants presented directly to the court certain additional evidence.
Of the five joint complainants in No. 102, Reynolds, Rosenthal, and Lay are medium sized or small meat packers, with some degree of integration in their operations, the details of which do not appear in the record. The other two, Heinz and Koblenzer, are non-processing slaughterers; that is, they are engaged in the slaughter of cattle and the sale of beef and veal carcasses and in the preparation and sale of wholesale cuts of beef and veal, but they do no substantial processing of beef carcasses or other materials derived from the slaughter of cattle. Kahn, the complainant in No. 103, states that it is "engaged in the Meat Packing business, and slaughters Cattle, Calves, Sheep, Lambs and Hogs; from these it produces Dressed Beef, Pork, Veal and Lamb, also the curing of all Pork products, such as Ham, Bacon, Picnics, Butts, Tongues and Pig Feet; and manufacturing Sausage, Lard, Tallow, Dried Blood, Fertilizer, Tankage, Grease, Casings, Live Stock Feed and Poultry Feed, as well as many other articles produced or manufactured by the Meat Packing Industry; is also engaged in curing and preparing hides, ready for the tanner, and lamb and pelt skins, ready for the wool pullers, and the dressing of poultry."
Complainants have attacked the regulation on the ground that, in the absence of ceilings on live cattle prices, they have advanced to a point that, under the established maximum prices for carcass beef and wholesale cuts, complainants and the industry generally are compelled to produce these commodities at a loss. To prove such losses, they have utilized the cut-out test method of accounting which for many years has been in vogue in the meat packing industry.
In our opinion in Armour & Company v. Bowles, 148 F.2d 529, we have described the organization of the industry, the cost accounting method in question, the history of price control of beef products under the Emergency Price Control Act, 50 U.S.C.A.Appendix § 901 et seq., and the subsidy program and cattle stabilization plan contained in the Directive of October 26, 1943, above mentioned. These matters will not be set forth again in the present opinion.
On the main point, the two consolidated cases now before us are governed by our decision in the Armour case. In that case we upheld the Administrator's contention that the cut-out test method of cost accounting is not an acceptable criterion for determining whether RMPR 169 establishes generally fair and equitable maximum prices. Since the over-all industry earnings under price control are well above their normal peacetime level, we held, applying the pricing standards approved by us in Gillespie-Rogers-Pyatt Co., Inc. v. Bowles, Em.App.1944, 144 F.2d 361, that the maximum prices in RMPR No. 169 must be deemed generally fair and equitable if they afford a sufficient margin to enable the industry generally to earn in its cattle operations as an entirety enough to cover its "out-of-pocket" costs in respect thereto. While insisting that the only relevant figures were its "losses" on carcass beef computed by the cut-out test method, Armour did submit in evidence its figures allocating and crediting to the beef division its equitable share of all profits made by the various processing departments out of by-products of cattle slaughter. These figures, for a large and representative packer, showed that its cattle operations as a whole, under price control, have not only returned the "out-of-pocket" costs, but also made a substantial contribution to the general overhead expense. The present complainants have not undertaken to make a similar allocation, asserting that it would be difficult, if not impossible, for them to do so. As the record stands, they have failed to sustain the burden of proving their case under the Gillespie formula as applied by us in the Armour case.
In the cases at bar, the Administrator maintained, as he did in the Armour case, that in the years before price control, the industry as a whole showed "losses" on the sales of carcass beef, using the cutout test method of accounting. He again put in evidence a graph with supporting data showing the relationship between the market prices of good and choice steers *280 and their reflected cut-out value since 1937 at the Chicago market; the conclusion to be drawn from this evidence is that, for most of that period, the market prices of the steer did in fact exceed the reflected cut-out value. Armour did not seek to controvert the existence of this historic "loss" on carcass beef; indeed, Armour's own figures on the cut-out test method (which are also included in the records of the present consolidated cases) seem to bear out the Administrator's statistics for the industry generally.
The present complainants, unlike Armour, have vigorously challenged this asserted fact of historical loss on carcass beef by the industry as a whole.
It is objected, first, that the Administrator's computation is based only on the two top grades of beef,[1] whereas complainants say that these two grades are generally the least profitable. As an answer to this objection, the Administrator included in an appendix to his opinion denying the protest upon reconsideration the cut-out results on the two lowest grades of carcass beef, medium and common or utility. The figures show for the medium grade a loss in each year since 1937, the loss greatly increasing after 1941; for the common or utility grade there is a positive margin of a few cents for three of the seven years. It appears that the average for the four grades of carcass beef will definitely show cut-out losses since 1937.
Next, complainants challenge the underlying statistical material used by the Administrator in computing the historical loss as being unreliable for the reason that it is based on the unweighted averages of the daily and monthly cattle highs and lows on the Chicago cattle market which, they say, does not give a true picture of what was actually paid for most of the cattle sold in any given day or month. A letter from Mr. Fred J. Beard, of the Market News and Grading Division, Livestock and Meats Branch, of the Department of Agriculture, put into the record by complainants, indicates that, on the whole, a long-run disparity between weighted and unweighted averages is unlikely. In further answer to the objection, the Administrator computed the weighted annual averages of cattle prices at Chicago from 1937 to 1943, and compared them with the unweighted averages. Use of the weighted averages still indicated cut-out losses for the years prior to price control, though in almost every year such losses appeared to be smaller than those shown with the use of the unweighted averages. While, therefore, then weighted average prices may overstate somewhat the prices actually paid for cattle, the use of the unweighted averages does not appear to be sufficiently inaccurate to undermine the conclusion of historical loss on the Chicago market.
Complainants also object that the Administrator confined his computations to figures at the Chicago market. But in his opinion upon reconsideration, the Administrator gives what seem to us persuasive reasons for accepting the price relationships at the important Chicago market as fairly representative of the country as a whole.
We cannot say that there is no substantial support in the evidence for the Administrator's conclusion that, for the industry generally, there have been historical cut-out losses on carcass beef. We do not discuss the evidence in more detail because we do not believe the point to be decisive. While the fact of such historical losses tends to fortify the Administrator's position as to the unacceptability of the cut-out test method, his rejection of the cut-out test as a measure of the fairness of the regulation rests primarily upon what he deems to be the inherent weaknesses of this accounting procedure, as explained in our Armour opinion.
There remains for consideration the validity of the regulation as applied to nonprocessing slaughterers, who are by far the most numerous group in the industry, though they account for only about 15% of the national cattle slaughter. As previously stated, two of the complainants in No. 102 are in this group.
The Administrator recognized that some special provision would have to be made for this important segment of the industry if the non-processing slaughterers were not to be driven to the wall. Due to the distinct economic position of this group as contrasted with that of the integrated processing slaughterers, the Administrator *281 would have been fully warranted in fixing higher ceiling prices for the nonprocessing slaughterers under his authority, in § 2(c) of the Act, 50 U.S.C.A.Appendix § 902(c), to establish in price regulations such classifications, differentiations, and reasonable exceptions, as in the judgment of the Administrator are necessary or proper in order to effectuate the purposes of the Act. He did not do this, because higher ceiling wholesale prices for nonprocessing slaughterers alone would have destroyed the foundation upon which were based the uniform dollars-and-cents retail prices regarded by the Administrator as essential to effective control of meat prices. Instead, he procured the adoption of the alternative program put into effect by the Directive of October 26, 1943, namely, the payment to non-processing slaughterers of a special additional subsidy of 80 cents a hundredweight, affording them a benefit equivalent to what they would have obtained by higher ceiling price differentials in their favor. In the Armour case we held that the regulation is not unlawfully discriminatory against the processing slaughterers in that they are permitted to realize only the ceiling prices plus the general subsidy paid to all slaughterers under the cattle stabilization plan, whereas the non-processing slaughterers receive in addition the special 80-cent subsidy.
If the maximum prices in RMPR 169, in conjunction with the subsidy payments, do not make adequate provision for the non-processing slaughterers as a group, do not afford a sufficient margin for profitable operation by this the most numerous group in the industry, then the regulation is invalid as to the non-processing slaughterers, despite the fact that the regulation is, as we held in the Armour case, generally fair and equitable as applied to the processing slaughterers who constitute the greater part of the industry by volume of business. We reject the Administrator's argument to the contrary. It is true, the Act does not guarantee a profit to each individual producer. And so, if the maximum prices enabled most of the non-processing slaughterers to operate profitably, the regulation would not be rendered invalid by the fact that an occasional marginal producer in the group could not stay in business under the established ceilings. But it does not follow from this that the Administrator can ignore the disastrous effect of the regulation upon a whole group of producers constituting an important segment of the industry who, because of the nature of their operations, have a common economic situation that sets them apart from the rest of the industry. As stated by the Director of Economic Stabilization: "The alternative of permitting the greater part of the nonprocessing slaughterers to be forced out of business would not only have been contrary to the national policy in favor of protecting small enterprises, but would have deprived the nation of slaughtering facilities which are needed to assure the full utilization of existing meat supplies." The Administrator himself, in his opinion of October 27, 1943, accompanying the first order denying the protests, fully recognized his obligation to remove the hardship inflicted upon this large group in the industry. He there said: "Social and economic considerations of great urgency are involved in the closing down of individual enterprises in an industry already dominated by a few large firms. In addition to these paramount considerations, the existence of this special problem presented the only serious legal challenge to the validity of the Regulation." As we said in Adams, Rowe & Norman, Inc. v. Bowles, Em.App.1944, 144 F.2d 357, 360: "We are confident that Congress intended, not only that the regulations should be `generally fair and equitable,' but that it should be the duty of the Administrator under § 2(c) to avoid or eliminate manifest inequities in exceptional classes of cases so far as this might reasonably be done consistently with the main objective of the Act and with the effective administration of the stabilization program."
It is insisted by the Administrator that adequate provision has in fact been made for the special case of the non-processing slaughterers. But on the evidence before us we cannot escape the conclusion that, as applied to the non-processing slaughterers as a group, the maximum prices in RMPR 169 plus the subsidy payments do not afford an adequate margin for profitable operation; indeed, do not permit this group of slaughterers to break even.
In this connection, we emphasize the Administrator's concession in his opinion of October 27, 1943, that the cut-out test, which he rejects as a criterion for determining the validity of the regulation as applied to the integrated processing slaughterers, "is an adequate basis for testing *282 the position of the non-processing slaughterers, since their actual realization from cattle is derived solely from the sale of the carcass and unprocessed by-products."
The Administrator further said in that opinion:
"Data obtained by the Office of Price Administration indicates that on a cut-out basis the carcass prices established by the Regulation with the subsidy payments now in effect reflect the following live cattle prices of the grades slaughtered by nonprocessors: choice, $15.10; good, $13.90; medium, $12.20; and common, $10.60. The upper limit of prices provided for in the Directive is, for the respective grades, $16.00, $15.25, $13.00 and $11.00. When the amount of livestock slaughter payments are varied according to grade, as specified in the Directive, the difference between these two sets of prices  the prices reflected by cut-out value and the upper limit of the prices specified in the Directive  will be $1.00 for each of the four grades.
"It is anticipated that the necessity for maintaining an average purchase cost below the upper limit, in order to avoid reductions in the subsidy, will keep average cattle prices slightly below the upper limit. And during the season of peak runs, the prices will range substantially below the upper limit."
This statement needs some explanation to indicate its full significance. It means that the Administrator undertook to determine what the level of live cattle prices must be in order that slaughterers might realize enough on the sale of carcass beef at the established maximum prices to cover their costs on the assumptions of the cut-out test method. In this computation he merely reversed the standard cut-out test procedure. He took the ceiling prices for the given grade of cattle and multiplied it by the average percentage dressing yield for that grade; this gave the value of the beef carcass on a live weight basis. He then added to this figure the value per cwt. live weight of all raw by-products obtained from the killing of the steer (these are the by-product credits in the normal cut-out test method), and added also the subsidy then in effect, payable to all slaughterers, which was $1.10 per cwt. regardless of grade. He deducted from the gross figure so obtained 60 cents per cwt. to cover the assumed killing and selling costs. The resulting figure, the so-called reflected cut-out value, was the highest price per cwt. at which a slaughterer might purchase live cattle without a cut-out loss resulting.[2]
The foregoing calculation was on the basis of the general subsidy payments in effect prior to the revision of the subsidy program by the Directive of October 26, 1943. These earlier subsidy payments were uniform, $1.10 per cwt. regardless of the grade of cattle purchased. The Directive of October 26, 1943, varied the general subsidy payments according to grade: choice, $1.00; good, $1.45; medium, $0.90; common, $0.50. Thus, in order to find the reflected cut-out value after the Directive went into effect, instead of adding a uniform subsidy of $1.10 regardless of grade, the subsidy to be added depends upon the grade of carcass beef for which the reflected cut-out value was being computed. The figures of reflected cut-out values in the quotation from the Administrator's opinion set forth above, after adjustment for the new subsidies payable to all slaughterers as specified in the Directive, become as follows:

 Choice Good Medium Common
 $15.00 $14.25 $12.00 $10.00

These figures coincide with the lower limit of the range for the corresponding grades under the cattle stabilization plan put in effect by the Directive. The upper limits of the ranges are:

 Choice Good Medium Common
 $16.00 $15.25 $13.00 $11.00

Thus there is a spread of $1.00 between the break-even point for processing slaughterers under the cut-out test and the top of the range.
*283 Since the Directive, in addition to the general subsidy payable to all slaughterers, provided also a special subsidy of 80 cents per cwt. for non-processing slaughterers, the break-even point for them under the cut-out test is correspondingly higher, namely:

 Choice Good Medium Common
 $15.80 $15.05 $12.80 $10.80

With cattle prices at the upper limits of the stabilization ranges, non-processing slaughterers would fall short of breaking even by 20 cents per cwt. even after the payment to them of the special subsidy.
It will be noticed from the above quotation that the Administrator anticipated that average cattle prices for the four grades mentioned would stay somewhat below the upper limits of the respective ranges. However, cattle prices have not behaved as the Administrator forecast. The averages for each grade at Chicago since November, 1943, have been as follows:

 Nov. Dec. Jan. Feb. Mar. Apr. May June July Aug. Sept.
 1943 1943 1944 1944 1944 1944 1944 1944 1944 1944 1944
 Choice 16.04 14.89 16.35 16.41 16.37 16.37 16.61 17.11 17.23 17.74 17.76
 Good 14.98 12.78 15.00 15.12 15.33 15.23 15.73 16.23 16.35 16.42 16.26
 Medium 12.88 10.71 12.94 13.44 13.59 13.84 14.47 14.73 14.62 14.04 13.40
 Common 10.64 10.84 11.53 12.02 11.65 12.58 12.19 11.71 11.07 10.86

Thus it appears that, for the four top grades of cattle to which the non-processing slaughterers confine their purchases almost exclusively, cattle prices since the date of the Directive have run pretty consistently above the tops of the respective stabilization ranges and well above the break-even levels for non-processing slaughterers. Figures for December, 1944, and January, 1945, for the two top grades, which have been called to our attention since the oral argument, bear out this tendency. With cattle prices running as they have since the cattle stabilization plan was put into effect, the non-processing slaughterers as a group, on the Administrator's own computation, have been afforded no margin for profitable operation. Indeed, consistent losses are indicated.
We have given above the break-even points for the various grades of carcass beef computed on the basis of an allowance by the Administrator of 60 cents per cwt. for killing and selling costs. It is contended that this 60-cent allowance is inadequate to cover the actual costs and that, if a proper allowance for such costs were made, cattle prices would have to run correspondingly lower to enable the non-processing slaughterers to break even on the cut-out test. Complainants put in evidence cost data from 20-odd slaughterers, none of whom had total killing and selling costs of less than 89 cents per cwt., and the average ran over $1.00. From figures put into the record by the Administrator covering the operations of a group of 19 non-processing slaughterers for January, February, and March, 1944, a computation made by the complainants indicates that the average of the costs of these firms for the three months was 93 1/3 cents. The Administrator himself, in computing his data to establish historical cut-out losses, allowed a total of 80 cents for killing and selling expenses. On the evidence in the record, it seems that the Administrator's allowance of 60 cents per cwt. for costs is too low. Just what the allowance should be we cannot say, but to the extent that the allowance is inadequate to cover costs there must be a revision upwards of the indicated losses suffered by non-processing slaughterers as a group under the existing maximum prices for carcass beef, with cattle prices running at the high levels of the past year.
In No. 102, a judgment will be entered setting aside Revised Maximum Price Regulation No. 169 in so far as the maximum prices therein for beef carcasses and wholesale cuts are applicable to non-processing slaughterers as defined in the Directive of October 26, 1943.
In No. 103, a judgment will be entered dismissing the complaint.
NOTES
[*] No. 102. Judgment vacated April 2, 1945 as to the non-processing slaughtering. Complaint dismissed July 31, 1945. See 150 F.2d 546.
[1] Chicago is an especially important market for choice and good grades of beef. It is estimated that the Chicago market accounts for about 30% of the national slaughter of these two grades, as against about 14% of all grades combined.
[2] Thus the ceiling price for choice beef carcass at Chicago was $20.50 per cwt. Multiplying this by the average dressing yield for choice grade  61%  gives $12.505. Adding to this a credit of $2.10 per cwt. on a live weight basis for by-products (the Administrator's figure), and the $1.10 subsidy, gives a resulting figure of $15.705. Deducting from that the 60-cent allowance for killing and selling expenses, the result is $15.105, the reflected cut-out value. This means that on a cut-out basis the slaughterer will just recover his costs if the live steer price was $15.105 per cwt.