## COUNSELMAN v. FLEMING, Temporary Controls Adm'r.

### No. 322.

United States Emergency Court of Appeals.

Heard at Washington, D. C., Feb. 15, 1947.

Decided April 23, 1947.
Writ of Certiorari Denied June 23, 1947.
See 67 S.Ct. 1756.

J. Robert Carey, of Washington, D. C., (Michael F. Keogh and Richard H. Love, both of Washington, D. C., on the brief), for complainant.

Irving J. Helman, of Washington, D. C., (Carl A. Auerbach, General Counsel, and William R. Ming, Jr., Associate General Counsel, both of Washington, D. C., all of Office of Price Administration, on the brief), for respondent.

Before MARIS, Chief Judge, and MA-GRUDER and McALLISTER, Judges.

MAGRUDER, Judge.

Ralph P. Counselman has for the past fifteen years or more been engaged in the purchase and slaughter of calves exclusively and the sale of veal carcasses, wholesale cuts, and edible and inedible by-products. He is what is described as a non-processing slaughterer. His business establishment is located in the District of Columbia. In April, 1943, Counselman was indicted in the District Court of the United States for the District of Columbia upon charges of illegal sales, during a period extending from December 23, 1942, to February 1, 1943, of dressed veal in excess of the maximum prices established by Revised Maximum Price Regulation No. 169—Beef and Veal Carcasses and Wholesale Cuts (7 F.R. 10381). He entered a plea of guilty on January 7, 1946, and has been sentenced to pay a fine of $4300.

In order to challenge the validity of the applicable regulation, complainant obtained leave of the district court to file the present complaint in this court under § 204(e) (1) of the Emergency Price Control Act, as amended, 58 Stat. 639, 50 U.S.C.A. Appendix, § 924(e) (1).

Since this is the first case in which we have had occasion to consider the validity of prices for veal established in RMPR 169, we shall state briefly the history of price control with relation to sales of veal carcasses and wholesale cuts.

Effective May 11, 1942, the General Maximum Price Regulation (7 F.R. 3153) brought wholesale dressed beef and veal prices under control by providing that a wholesaler's maximum price for a sale to a purchaser of a given class should be that seller's highest selling price in March, 1942, to a purchaser of the same class. The Price Administrator, however, quickly issued a more specific regulation—Maximum Price Regulation No. 169 (7 F.R. 4653), effective July 13, 1942—covering sales of beef and veal at the wholesale level. MPR 169 provided that the maximum price for each grade of beef or veal carcass should be the highest price actually charged by the seller during the period March 16 to March 28, 1942, at or above which at least 30 per cent of the total weight volume of the seller's sales of carcasses of the same grade were made during such period. This regulation was designed to eliminate the possibility that isolated, unrepresentative sales during March of 1942 would determine the entire maximum price level. Thus under MPR 169 the effect of occasional sales either above or below the general level of base period prices was neutralized to a great extent.

Prior to December 16, 1942, the maximum wholesale prices for beef and veal were determined in the same manner, that is, by reference to the base period of March 16 to March 28, 1942. However, on December 16, 1942, the Price Administrator abandoned the "freeze" type regulation for beef and, by Revised Maximum Price Regulation No. 169 (7 F.R. 10381), specific dollars-and-cents ceiling prices were established for carcasses and wholesale cuts of beef, with price differentials for various zones. For veal, RMPR 169 retained the same base period and "freeze" type control as had existed under MPR 169. It was not until the Price Administrator issued Amendment 4 to RMPR 169 (8 F.R. 4097, effective April 3, 1943), that specific dollars-and-cents ceiling prices were established for veal. In June, 1943, maximum wholesale prices for beef and veal were reduced pursuant to an order of the Economic Stabilization Director so as to permit a 10 per cent reduction in retail prices (Amendment 15 to RMPR 169, 8 F.R. 7675). By Regulation No. 3 (8 F.R. 10826) issued by the Defense Supplies Corporation, this reduction was compensated for by the payment of corresponding subsidies to slaughterers so that they, in turn, could continue to pay the same prices as before for live cattle. Pursuant to a Directive of the Economic Stabilization Director issued October 25, 1943, a special differential subsidy of 80 cents a hundredweight was made

payable to non-processing slaughterers of cattle. This extra subsidy applied to beef only; it was not considered necessary to make any similar special provision for non-processing slaughterers of veal.

Since the violations for which Counselman was indicted covered a period prior to April 3, 1943, the effective date of Amendment 4 to RMPR 169, the maximum prices under attack in this proceeding are the "freeze" prices determined by the individual experience of each slaughterer during the base period March 16-28, 1942.

 It is objected that the maximum prices for veal, during the period in question, were arbitrary and capricious as applied to non-processing slaughterers in that this distinct segment of the industry could only operate at a loss under the applicable prices. Cf. Heinz v. Bowles, Em.App., 1945, 149 F.2d 277, and, on reconsideration, Em.App., 1945, 150 F.2d 546, involving the validity of RMPR 169 maximum beef prices as applied to non-processing slaughterers of cattle. Complainant has failed to sustain the burden of proof resting upon him in this matter.

 Upon application of complainant, we directed the Price Administrator to receive certain evidence which complainant desired to be included in the record. One item so introduced was a profit and loss statement covering complainant's own operations for the period from December 16, 1942, to February 1, 1943. According to that statement complainant paid a total of $219,471.72 during the period in question for calves which yielded only $122,575.34 worth of dressed veal at the established ceiling prices. Taking account of net sales of by-products and of costs of operation, the statement showed a net loss of $67,002.30 for the month and a half period. The Price Administrator was somewhat skeptical of these figures because of their disproportionate nature; and entered an order affording complainant an opportunity to present a detailed breakdown of the figures which, however, complainant failed to do.* It may be said, further, that the brief period covered by the figures would not necessarily be representative of complainant's over-all operational experience under RMPR 169, because the cost of calves is then at a seasonally high point. In addition to that, as we said in the Heinz case, supra, 149 F.2d at 281, the Act does not guarantee a profit to each individual producer, and so, "if the maximum prices enabled most of the non-processing slaughterers to operate profitably, the regulation would not be rendered invalid by the fact that an occasional marginal producer in the group could not stay in business under the established ceilings."

 Complainant urges that the adverse effect of RMPR 169 upon non-processing slaughterers of veal as a group may be inferred from evidence in the record as to the movement of prices for live calves. The average cost of calves slaughtered in the United States in March of 1942, which included the base period used by RMPR 169, was $12.29 per cwt. live weight. The average cost of calves slaughtered in the United States steadily increased from $11.66 per cwt. in November, 1942, to $13.84 per cwt. in February, 1943. If the cost of live calves had remained at the level it reached in February, 1943, complainant's case would have been stronger. But the figures indicate that live calf prices declined after May, 1943, and in November, 1943, reached a low of $10.65 per cwt., which was $1.64 per cwt. below the average March, 1942, price. Moreover, the average cost for the year 1942 was $12.07 per cwt. and for 1943, $12.28 per cwt., both figures being less than the average cost of calves slaughtered in the United States in March, 1942. The figures for the years 1942, 1943 and 1944, showing the total number of calves received and slaughtered at public stockyards, indicate that the supply of salable calves was greatest during the months of August, September, October and November, and lowest during January and February. The figures for those three years

---

* The order called for the following information: live weight purchased, costs per pound live weight, transportation and slaughtering costs, all other operational expenses, yield per cent, returns from by-products itemized, ceiling price per cwt., and total cost of dressed veal per cwt.

also show, as would naturally be expected, that average live cattle prices in the United States were generally lowest during October and November and highest during the first quarter of the year. When an industry is subject to such seasonal fluctuations in regard to its most important cost item, we think that the reasonableness of the established maximum prices must be viewed with reference to the complete cycle of the fluctuations and not with reference solely to the period of the cycle during which the costs are highest. It is also significant that the maximum prices for veal, now subject to challenge in this case, were established by reference to the experience of the individual slaughterer during March, 1942, which period corresponded with a high point in the cycle of live calf prices.

In his Statement of Considerations accompanying the issuance of RMPR 169 on December 10, 1942, the Price Administrator pointed out certain defects and inequities which had become evident from experience under the earlier regulations utilizing the "freeze" technique. One of the defects mentioned was that "it permitted some packer ceiling prices disproportionately high in relation to the price ceilings of other packers. The irregularity of price ceilings among packers, in turn, permitted those with higher ceiling prices to outbid the others for the available supply of cattle. This tended to force cattle prices higher than they would have been if all packers were on a more equal competitive basis in bidding for the available supply of cattle." For this, and other reasons, the Price Administrator in RMPR 169 proceeded to establish specific dollars-and-cents maximum prices for carcasses and wholesale cuts of beef, with appropriate price differentials for various zones. This applied only to beef, not to veal, the maximum prices for which remained, for the time being, as they had previously been established by the "freeze" method. However, the Statement of Considerations declared the Price Administrator's intention in the near future to establish, by amendment to RMPR 169, specific dollars-and-cents prices for veal in the same zone structure. Complainant argues that it was

arbitrary and capricious for the Price Administrator, while thus correcting inequities that had become apparent in MPR 169 as applied to beef, to fail to make a corresponding correction with reference to veal at the same time. The answer, of course, is that difficulties with the structure of beef prices presented the most urgent administrative problem. Very few protests had been received by the Price Administrator directed against the ceilings for veal. The maximum prices for all meat products—beef, pork, lamb and mutton, processed products, etc.—which originally were established by the relatively simple "freeze" method, were by gradual stages changed to specific dollars-and-cents ceilings, as the Price Administrator found time to complete the necessary preliminary studies. The proper adjustment of dollars-and-cents maximum prices was a matter of great complexity. We think it was entirely reasonable for the Price Administrator to set dollars-and-cents prices for beef as soon as he could, leaving to the future a similar action with reference to veal. Amendment 4 to RMPR 169, making the transition from "freeze" prices to specific dollars-and-cents prices as applied to veal, followed within a reasonably short time thereafter.

We have already held that the Price Administrator was empowered to establish maximum prices by the method of freezing each individual seller to the prices he had charged in a reasonable base period. United States Gypsum Co. v. Brown, Em.App., 1943, 137 F.2d 803, certiorari denied 1944, 320 U.S. 799, 64 S.Ct. 427, 88 L.Ed. 482. It is inherent in this type of price control that there will be some variation in maximum prices as between various sellers based upon their respective pricing policies in the base period. Such competitive disadvantage as might thereby result to some sellers did not render the regulation invalid. Jo van der Loo v. Porter, Em.App. 1946, 160 F.2d 110. Furthermore, it so happened that complainant, in relation to his competitors, fared pretty well under the freeze method of price control as regards veal of Grade A, the only grade he was charged with selling at unlawful prices. For this grade,

complainant's maximum price was higher than that of either of the other two slaughterers in the District of Columbia and higher also than the average for 157 other slaughterers located in his zone.

A judgment will be entered dismissing the complaint.