## SUPERIOR PACKING CO. v. CLARK.
### No. 276.

United States Emergency Court of Appeals.

Heard at Chicago April 11, 1947.
Decided Nov. 10, 1947.

Theodore E. Rein, of Chicago, Ill. (Alexander T. Spare, of Chicago, Ill., and Richard S. Felhaber and Gustav A. Larson, both of St. Paul, Minn., on the brief), for complainant.

Irving J. Helman, of Washington, D. C. (Carl A. Auerbach, Gen. Counsel, William R. Ming, Jr., Associate Gen. Counsel, and Harry H. Schneider, Asst. Gen. Counsel, all of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and LINDLEY, Judges.

MAGRUDER, Judge.

In this complaint, filed pursuant to § 204 (e) of the Emergency Price Control Act, 50 U.S.C.A.Appendix, § 924(e), Superior Packing Company challenges the validity of provisions of Revised Maximum Price Regulation No. 169—Beef and Veal Carcasses and Wholesale Cuts (7 F.R. 10381), and Maximum Price Regulation No. 398—Variety Meats and Edible By-Products at Wholesale (8 F.R. 6945).

Complainant is a non-processing slaughterer of cattle, with a place of business in St. Paul, Minnesota. It ships beef carcasses, wholesale cuts, variety meats and edible unprocessed by-products derived from cattle slaughter to Boston, New York, Washington and other large cities, both in carload lots and in less-than-carload lots. During the period of price control, complainant was subject to RMPR 169 and MPR 398.

RMPR 169 established basic dollars-and-cents maximum prices for beef and veal carcasses and wholesale cuts, with appropriate zone differentials. Section 1364.454 enumerated amounts which might be added to the applicable zone prices in certain specified cases to cover extra costs involved. Similarly, § 1364.453 enumerated amounts which had to be deducted from the applicable zone prices in situations where certain costs had not been incurred. Among the latter was a provision for a carload discount. Section 1364.453(b), as amended (8 F.R. 9996), provided: "(b) Carload discount. For all beef carcasses and/or beef wholesale cuts and/or other meat items subject to this subpart B and § 1364.453 and §1364.454, delivered in a straight or mixed carload shipment or sold as a part of a straight or mixed carload sale, the seller shall deduct 25 cents per hundredweight from the applicable zone price."[1]

In § 1364.455(a) (2), "Carload" was defined, in part, as follows: "(i) A shipment by rail of fresh or frozen wholesale meat cuts, and/or cured meat cuts, meat or processed products and/or carcasses, or any combination of the foregoing to a single delivery point, of at least the minimum weight upon which the railroad carload rate from the point of shipment to the delivery point, as evidenced by the tariffs of railroad carriers, is based: Provided, That where the transportation charge for shipment of a lesser weight at the railroad carload rate would be lower than the transportation charge for such a shipment at the railroad less-than-carload rate, such lesser weight shall be considered a carload".

The Price Administrator explained in his Statement of Considerations that the carload discount provision was inserted because the base prices in the regulation had been established for less-than-carload lots, whereas it costs less to sell in larger quantities. "This reduction", the Price Administrator said, "roughly reflects the savings in handling and selling costs which are effected when a single buyer takes one delivery of a volume this large."

MPR 398 was similar to RMPR 169 in its price structure and contained a carload discount provision identical in effect. Section 15(b) of MPR 398, as amended (8 F.R. 11084), read as follows: "(b) Carload discount. For all variety meats and edible by-products delivered in a straight or mixed carload shipment or sold as a part of a straight or mixed carload sale, the seller shall deduct 25 cents per hundredweight from the applicable zone price."

These carload discount provisions constitute the chief subject of controversy in the case at bar.

For many years prior to price control, Superior Packing Company followed two systems or methods of shipping beef carcasses, wholesale cuts, variety meats and edible by-products to various eastern points, pursuant to contracts for the sale of portions of such carloads to individual customers. Complainant designates these two systems as its "Washington system" and its "Boston system", respectively.

Under the Washington system, complainant would ship a carload lot to an eastern city consigned to complainant or its agent. Upon arrival of the car at the city of destination, complainant would arrange with a public cartage company for delivery to the

---

[1] As originally provided, the carload discount was 75 cents per cwt. (7 F.R. 10389).

respective places of business of the buyers who had made the several smaller purchases included in such carload. Both the railroad freight charges and the local delivery charges would be paid by complainant. Under the Washington system, complainant was not considered by the OPA as coming within the carload discount provisions of RMPR 169 and MPR 398, and hence was not required to make the deduction of 25 cents per cwt. from the applicable zone price. In addition, under this system, complainant was permitted, by § 1364.-454(3), to make a straight charge of 25 cents per cwt. for the local delivery from freight car to each purchaser.[2]

Under the Boston system, complainant, after having received sufficient orders from buyers in an eastern city to make up a carload, would ship a carload lot consigned to one of the purchasers, separately invoicing, as under the Washington system, those portions of the carload to the several customers who had made the individual purchases which combined to make up the carload lot. The railroad freight charges would be paid by complainant, again as under the Washington system, but not the local cartage charges. Upon arrival of the car at the city of destination, the consignee would notify the other purchasers, each of whom would make his own arrangements for delivery at the freight car of the portion invoiced to him, paying the local delivery charge for the transportation from the freight car to his place of business. The Boston system is the one involved in the present case.

On October 5, 1944, the Price Administrator filed a complaint against Superior Packing Company in the United States District Court for the District of Minnesota for treble damages and for an injunction under §§ 205(e) and 205(a) of the Act, 50 U.S.C.A.Appendix, § 925(a, e). The complaint charged that Superior Packing Company, during the period October 6, 1943, to October 4, 1944, had committed violations of § 4 of the Act, 50 U.S.C.A.

Appendix, § 904, by making sales and deliveries of beef carcasses, wholesale cuts, variety meats and edible by-products in violation of RMPR 169 and MPR 398 in that Superior Packing Company delivered said meat items in straight or mixed carload shipments, or sold the same as part of a straight or mixed carload sale, but failed to deduct 25 cents per cwt. from the applicable zone price as required by § 1364.453(b) of RMPR 169 and § 15(b) of MPR 398. Pursuant to a stipulation of facts, the District Court found that, on and between October 6, 1943, and October 4, 1944, Superior Packing Company had sold and delivered meat items in straight and mixed carload shipments to multiple purchasers, as under the Boston system above described, and in such transactions had failed to deduct the carload discount of 25 cents per cwt. from the applicable zone price. It ruled that, on the facts as found, such deduction was required by the carload discount provisions of both regulations. Judgment was entered against Superior Packing Company in the sum of $29,814.47, and the defendant was enjoined from future violations. Bowles v. Superior Packing Co., D.C., 1945, 63 F.Supp. 12. This judgment has been affirmed, sub nom. Superior Packing Co. v. Porter, 8 'Cir., 1946, 156 F.2d 193, certiorari denied 1946, 329 U.S. 788, 67·S. Ct. 355.

Within three days after judgment was entered in the District Court, Superior Packing Company filed in that court its application for leave to file a complaint in the Emergency Court of Appeals challenging the validity of the two regulations upon which the enforcement suit had been based. By order entered October 31, 1945, the District Court granted such leave, pursuant to § 204(e) of the Act. Thereafter, the pending complaint was duly filed in this court.

Complainant contended in the enforcement proceedings, and renewed the contention in this court, that the carload discount provisions of RMPR 169 and MPR 398, properly interpreted, applied

---

[2] In an affidavit by complainant's general manager, it is averred that the actual cost of such local cartage was 15 cents per cwt., with the result that under the Washington system complainant received a spread of 10 cents per cwt., the difference between the actual cartage cost and the authorized delivery charge of 25 cents per cwt.

only to shipments in carload quantities to single buyers of carload quantities; and therefore that the 25 cents per cwt. discount was not required in the transactions in question. This issue, involving the interpretation of the regulations, was squarely litigated in the enforcement action, and was decided against Superior Packing Company in the District Court and in the Circuit Court of Appeals, which affirmed the District Court's judgment. It cannot now be relitigated in this court. Van der Loo v. Porter, Em.App., 1946, 160 F.2d 110, certiorari denied 1946, 329 U.S. 774, 67 S.Ct. 193. We must take it that the transactions in question were in violation of the regulations, and confine ourselves to issues as to the validity of the regulations as so construed.

■ It is argued by complainant that carload shipments under the Boston system are essentially the same type of transaction as carload shipments under the Washington system; that since, under the Washington system, complainant not only did not have to deduct the carload discount but received an additional spread of 10 cents per cwt. as the result of the authorized local cartage charge of 25 cents per cwt.,[3] it was arbitrary and capricious for the regulations to require the carload discount in shipments under the Boston system. It is true, complainant paid the railroad freight charge under both methods of shipment. Also, under each system the shipments, pursuant to applicable railroad tariffs, were accorded a transportation rate lower than the rate for less-than-carload shipments. Since the base prices in RMPR 169 and MPR 398 were established for less-than-carload lots, complainant's margin or spread was enlarged by the economy of carload shipments under the Washington system as well as under the Boston system. But we cannot say that the two types of transaction were so nearly identical in effect as to make it irrational for the Price Administrator not to treat them alike so far as the carload discount is concerned. As the

District Court pertinently observed: "It may not be amiss to point out, however, that, under the so-called Washington method, the seller is responsible for the entire shipment until it reaches the buyer's hands. It has to supervise the transportation from the single delivery point to the buyer's place of business, and the title to the carload products remains in the seller when it reaches its destination and until it is deposited at the buyer's place of business. Under these circumstances it would seem reasonable to conclude that such a practice does not constitute a carload sale to certain buyers at a single point of delivery. Rather, it may be likened to the delivery of meat from the seller's own place of business."

Furthermore, if perchance the Price Administrator erred on the score of too great liberality in the maximum prices and allowable charges for complainant's sales and deliveries under the Washington system, that, in itself, would not establish that the carload discount provisions were arbitrary and capricious as applied to complainant's sales and deliveries under the Boston system.

In another attack upon the validity of the discount provisions, complainant lays great emphasis upon the Price Administrator's explanation, in his Statement of Considerations accompanying the original issuance of RMPR 169, to the effect that the carload discount "roughly reflects the savings in handling and selling costs which are effected when a single buyer takes one delivery of a volume this large."[4]

It is pointed out that under the carload discount provisions, as they have been interpreted in the enforcement action against complainant, the same flat carload discount of 25 cents per cwt. is required whether the carload shipment is to a single buyer of the whole carload quantity, or to several buyers of less-than-carload quantities, the aggregate of which makes up a carload shipment. While the seller makes a saving in railroad freight charges by carload shipments in either of these situations, com-

[3] See footnote 2, supra.
[4] It may be noted that this statement was made with reference to a carload discount of 75 cents per cwt., as was originally provided in RMPR 169. Amendment 21 to RMPR 169, issued July 16, 1943, reduced the discount to 25 cents per cwt. (8 F.R. 9995).

plaintant asserts, and it no doubt is true, that other handling and selling costs are somewhat greater when the seller sells a given carload quantity to several buyers than when he makes a sale of a carload quantity to a single purchaser. In an affidavit by complainant's manager it is stated: "Selling and distributing to the several buyers who purchase in less than carload lots, from a carload consignment, involve separate overhead expense, additional time, separate bookkeeping, invoicing and billing, separate collections and other overhead expense, incidental to transactions with individual buyers."

■ But complainant admittedly made some saving of freight charges by carload shipments under the Boston system. The burden of proof is upon complainant to show that it was unreasonable to require a carload discount of 25 cents per cwt. in view of that saving. No figures have been submitted to show the amount of such saving. For all we know, the freight saving may nearly approximate the amount of the required discount. Nor are there any figures in the record to indicate the amount of increased overhead expense of making sales to three, four or five buyers as contrasted with the cost of selling the same aggregate carload quantity to a single buyer. Complainant apparently thinks that the Price Administrator was under an obligation so to refine the carload discount as to make the discount progressively smaller as the number of buyers of portions of a carload shipment increased. There is no sufficient foundation in the record for a conclusion by us that such detailed refinement was practicable, or necessary in order to render the discount provisions generally fair and equitable.

■ More fundamentally, complainant argues that the commodities to which RMPR 169 and MPR 398 applied were "agricultural commodities"; hence that the regulations in their entireties, having been issued without the prior written approval of the Secretary of Agriculture, were void ab initio by force of § 3(e) of the Emergency Price Control Act, 50 U.S.C.A.Appendix, § 903(e). RMPR 169 has been before this court in many previous cases, in which competent counsel challenged the regulation on a variety of grounds, not, however, advancing this particular argument. See Armour & Co. v. Bowles, Em.App., 1945, 148 F.2d 529, certiorari denied 1945, 325 U.S. 871, 65 S.Ct. 1411, 89 L.Ed. 1989; Heinz v. Bowles, Em.App., 1945, 149 F.2d 277, certiorari denied, 1945, E. Kahn's Sons Co. v. Bowles, 326 U.S. 719, 66 S.Ct. 24, 90 L.Ed. 426; and on reconsideration, Em.App., 1945, 150 F.2d 546; Oswald & Hess Co. v. Bowles, Em.App., 1945, 148 F.2d 543, certiorari denied 1945, 325 U.S. 871, 65 S.Ct. 1411, 89 L.Ed. 1990; Ben H. Rosenthal & Co., Inc. v. Porter, Em. App., 1946, 158 F.2d 171; Counselman v. Fleming, Em.App., 1947, 161 F.2d 203, certiorari denied, 1947, 331 U.S. 861, 67 S.Ct. 1756. That, of course, does not disprove the soundness of the new argument; but it does suggest to us that the argument should be examined with a robust skepticism. Upon full consideration we have concluded that the point is not well taken.

Section 3(e) of the Act in its original statutory form and as it read all during the period now in question was as follows: "(e) Notwithstanding any other provision of this or any other law, no action shall be taken under this Act by the Administrator or any other person with respect to any agricultural commodity without the prior approval of the Secretary of Agriculture; except that the Administrator may take such action as may be necessary under section 202 and section 205(a) and (b) to enforce compliance with any regulation, order, price schedule or other requirement with respect to an agricultural commodity which has been previously approved by the Secretary of Agriculture."

As we pointed out in Taub v. Bowles, Em.App., 1945, 149 F.2d 817, 823, certiorari denied, 1945, 326 U.S. 732, 66 S.Ct. 39, 90 L.Ed. 435, the phrase "agricultural commodity" in § 3(e) was in obvious contrast with the language of § 3(c): "(c) No maximum price shall be established or maintained for any commodity processed or manufactured in whole or substantial part from any agricultural commodity below a price which will reflect to producers of such agricultural commodity a price for

such agricultural commodity equal to the highest price therefor specified in subsection (a)."

A live steer is an "agricultural commodity", produced on a farm and sold by a farmer in its raw, natural or unprocessed state. A beef carcass, a wholesale cut, retail cuts such as steaks or roasts, beef brains, kidneys, hearts, livers, or other edible by-products, as well as meat products resulting from still further processing, such as sausages—these are all distinct commodities not produced on the farm and sold by farmers. They are not "agricultural commodities", but commodities "processed or manufactured in whole or substantial part" from an agricultural commodity, the live steer. The slaughterer's operation of producing these various meat products would be described as a processing operation in the everyday use of words,[5] and it certainly is such from the point of view of the steer.

Though we think the statutory language is clear enough in itself, reference to the legislative history of the Emergency Price Control Act reenforces our conclusion. What became § 3(e) of the Act was the outgrowth of an amendment to the bill offered on the Senate floor by Senator Bankhead. In its original form, the amendment read: "Notwithstanding any other provision of law, no action shall be taken by the Administrator or any other person with re-spect to any agricultural commodity or commodity processed or manufactured in whole or substantial part from any agricultural commodity, without the prior approval of the Secretary of Agriculture." (88 Cong.Rec. 172)

This was objected to as much too broad, and Senator Bankhead promptly substituted a more restricted version reading: "Notwithstanding any other provisions of this or any other law, no action shall be taken under this act by the Administrator or any other person with respect to any agricultural commodity without the prior approval of the Secretary of Agriculture." (88 Cong.Rec. 160)

In explaining his willingness to make this change, Senator Bankhead said that of course "we had no desire to have the amendment cover anything but products dealt with by the Department of Agriculture and in the production and price of which the farmer, the agricultural producer, has a direct, immediate, primary interest." (88 Cong.Rec. 160) The course of the debate makes clear that it was the intention not to require prior approval by the Secretary of Agriculture in the case of regulations relating to commodities processed or manufactured from agricultural commodities. See 88 Cong.Rec. 160, 172, 173, 180, 186. See also Bowles v. American Brewery, Inc., 4 Cir., 1945, 146 F.2d 842, 844.[6]

---

[5] This is not at all inconsistent with the fact that complainant, in another context, would be described by the shorthand term "non-processing slaughterer" within the subsidy regulation issued by Defense Supplies Corporation. See Earl C. Gibbs, Inc. v. Defense Supplies Corp., Em.App. 1946, 155 F.2d 525, certiorari denied 1946, 329 U.S. 737, 67 S.Ct. 51. As the term is there specially defined for a limited purpose, it is evident that the differential subsidy was to benefit persons engaged almost exclusively in the slaughter of cattle and the preparation and sale of beef carcasses and wholesale cuts, as distinguished from slaughterers more highly integrated in their operations who engage in the further processing of beef carcasses and other materials derived from slaughter into profitable by-products such as sausages, lard, tankage, grease, fertilizer, pharmaceuticals, oils, etc.

[6] The Third Intermediate Report of the Select Committee to Investigate Executive Agencies (H.R.Rep.No.898, 78th Cong., 1st Sess.), submitted November 29, 1943, contained the following (pp. 6–7):

"In dealing with the questions involved in the fixing of maximum prices upon livestock, several distinctions must be made to avoid confusion:

First. Agricultural commodities are one thing, and products 'processed' in whole or in part from agricultural commodities are another thing. This distinction is consistently maintained in the statutes, Executive orders, and regulations. Thus, steers on the hoof are 'agriculture' while 'beef' is processed.

\* \* \* \* \* \* \*

Third. The Price Control Act, in dealing with both agricultural and processed commodities, contains two lines of authority. It provides (a) who may fix

When the question of extending the Emergency Price Control Act was before Congress in 1944, attention was directed to the fact that the administrative agencies concerned had construed § 3(e) so as to exclude meat and meat products from the term "any agricultural commodity". Representatives of various interested organizations requested amendments so as to bring all meat and meat products within the coverage of § 3(e). See Hearings before Senate Committee on Banking and Currency, 78th Cong., 2nd Sess. (1944), on S. 1764, pp. 395, 502, 524, 543. Amendments along this line were opposed by the Price Administrator. See id. at 1441, 1457. By the Stabilization Extension Act of 1944, the Emergency Price Control Act was extended for another year without making any substantial change in the language of § 3 (e). 58 Stat. 632. Such change in the law was not made until the next year when, by § 5(a) of Public Law No. 108 (79th Cong., 1st Sess.), § 3(e) of the Emergency Price Control Act was amended to read as follows, 59 Stat. 307, 308: "(e) Notwithstanding any other provision of this or any other law, no action shall be taken under this Act by the Administrator or any other person, without prior written approval of the Secretary of Agriculture, with respect to any agricultural commodity or with respect to any regulation, order, price schedule or other requirement applicable to any processor with respect to any food or feed product processed or manufactured in whole or substantial part from any agricultural commodity; except that (1) the foregoing provisions of this subsection shall not apply in the case of any individual adjustment making an increase in a maximum price, and (2) the Administrator may take such action as may be necessary under section 202 and section 205 to enforce compliance with any regulation, order, price schedule or other requirement which is lawfully in effect."

After this change in § 3(e) became effective, July 1, 1945, the Price Administrator was careful not to issue any further amendments to RMPR 169 or MPR 398 without obtaining the prior approval of the Secretary of Agriculture.[7] The period of violations involved in the case at bar ended October 4, 1944, so the lack of approval of the regulations by the Secretary of Agriculture during that period is without legal significance.

■ There is also a question whether, during the period October 6, 1943, to October 4, 1944, the provisions of RMPR 169 establishing basic zone prices for beef carcasses and wholesale cuts were arbitrary and capricious, and therefore invalid, as applied to that distinct segment of the industry referred to as non-processing slaughterers.[8] Cf. Heinz v. Bowles, supra. If this were shown, then the enforcement suit against complainant would necessarily fail, even though (as we have ruled above) the carload discount provision of the regulation was valid, separately considered; for the carload discount was a deduction which the seller had to make from the applicable zone price in computing the ultimate selling price permitted by the regulation. Complainant would, therefore, not be liable for having sold at the full zone price without allowing the carload discount if the applicable zone price were itself invalid.

In complainant's application to the District Court for leave to file a complaint in the Emergency Court of Appeals, this issue as to the validity of the basic maximum prices of RMPR 169 was raised in only very general language. It is apparent, however, from the remarks of the District Judge at the argument on the application, that he understood that complainant sought to litigate in this court matters which had been considered in the Heinz case, and that he intended to give complainant leave so to do. Counsel for complainant, in brief

---

the price and (b) what price may be fixed. * * *

The power to fix the price of meat as a 'processed' commodity is vested in the Price Administrator.

The power to fix the price of 'steers or other livestock on the hoof' is vested in the Price Administrator subject to the

prior approval of the Secretary of Agriculture."

[7] See, for example, Amendment 57 to RMPR 169 (10 F.R. 9878), and Amendment 10 to MPR 398 (10 F.R. 11897).

[8] A similar challenge to the validity of the maximum prices in MPR 398 has been abandoned by complainant.

and oral argument before us, did not press the issue of the validity of RMPR 169 for the period subsequent to November 1, 1943, when the special subsidy for non-processing slaughterers went into effect; that is, we were not asked to reconsider our decisions in the Heinz case, supra, and in Ben H. Rosenthal & Co., Inc. v. Porter, supra. Counsel did, however, ask us to declare the regulation invalid for so much of the period of violations covered by the enforcement suit as preceded the institution of the special subsidy—from October 6 to October 31, 1943. We think we are now required to rule on this point, which has not been decided in any previous case before us. To avoid undue repetition, we refer to our lengthy opinions in Armour & Co. v. Bowles, supra, and the Heinz case, supra, for the complicated background of RMPR 169.

When RMPR 169 was issued, on December 10, 1942, it was predicated upon the theory and expectation that, even without ceiling prices on live cattle, the influence of wholesale beef ceiling prices would result in maintaining the historical relationships between wholesale beef and livestock prices, so as to afford a generally fair and equitable margin for the industry engaged in the production of beef carcasses and wholesale cuts. See the Armour case, supra, 148 F.2d at 531-32. Unfortunately, this expectation was not fulfilled, under the abnormal conditions of a wartime economy. Soon after RMPR 169 was issued, cattle prices began to rise; and the cattle prices on which the regulation appears to have been predicated were soon left behind in the rising market. Protests against the regulation poured in to the Price Administrator, who was greatly concerned with the trend of cattle prices. It was recognized that the small non-processing slaughterers were being squeezed the most, since they were unable to make up their fresh beef losses by profits from the processing of by-products. Eventually it was decided not to meet the situation either by imposing ceilings on cattle prices or by raising the level of maximum prices in RMPR 169. Rather, by a Directive of the Economic Stabilization Director issued October 25, 1943 (8 F.R. 14641), the general subsidy applicable to all slaughterers was tied in with a cattle stabilization plan, which, it was hoped, would constitute an effective indirect control of live cattle prices. See the Armour case, supra, 148 F.2d at 532-33, for the mechanics of this plan. In addition, in recognition of the distinct economic situation of the non-processing slaughterers, a differential subsidy of 80 cents a cwt. was provided for this segment of the industry.

In our first opinion in the Heinz case (149 F.2d 277), we held, on the record then before us, that the maximum prices established by RMPR 169, even with the addition of the special subsidy, were not sufficient to enable the non-processing slaughterers as a group to break even; and therefore we declared the regulation invalid as to that segment of the industry. Upon reconsideration, after the record was opened for the introduction of additional evidence of actual operating results for the whole of 1944 and the early months of 1945, in respect of a group of non-processing slaughterers claimed to be representative of this segment of the industry, we stated our conclusion "that the record now contains substantial evidence which, especially in view of recent revisions and enlargements of the subsidy payments, amply supports the Administrator's contention that the regulation is presently valid [that is, as of July 31, 1945] even as applied to the nonprocessing slaughterers, whatever it may have been at some period or periods in the past. In this proceeding we are not called upon to render a declaratory judgment as to the validity, or invalidity, of RMPR 169 as of some date in the past." In Ben H. Rosenthal & Co., Inc. v. Porter, 158 F.2d 171, we considered the validity of RMPR 169 as of past periods during which criminal violations were alleged to have occurred. We there dismissed three complaints filed pursuant to § 204(e) of the Act, holding that the complainants had failed to sustain their burden of satisfying us that the maximum prices of RMPR 169, in conjunction with the subsidies, did not afford a sufficient margin to the non-processing slaughterers as a group during December, 1943, January,

1944, and the months of January, February and March, 1945.

■ In working out the cattle stabilization plan and in determining the appropriate amount of the differential subsidy to non-processing slaughterers, the Price Administrator computed a so-called "reflected cut-out value", that is, the highest price per cwt. at which a non-processing slaughterer could purchase live cattle without a cut-out loss resulting, under the maximum prices which the slaughterer was permitted to charge pursuant to the provisions of RMPR 169. The method of computation is described in the Heinz case, supra, 149 F.2d at 282. From this it appears that, prior to November 1, 1943, when the special subsidy for non-processing slaughterers became effective, a non-processing slaughterer, if he would merely break even, could not pay more for live cattle than the following:

| Choice | Good | Medium | Common |
|--------|------|--------|--------|
| $15.10 | $13.90 | $12.20 | $10.60 |

But all during the period from the issuance of RMPR 169, in December, 1942, to November 1, 1943, the prices of live cattle for each of these four grades in the Chicago market, as disclosed by official reports incorporated in the record, ran consistently well above the foregoing levels, except for Common or C grade which for a brief period toward the end of the year ran slightly under the break-even level of $10.60 for that grade. The average prices per cwt. of beef steers sold out of first hands at Chicago for slaughter, for the year 1943, were as follows:

| Choice | Good | Medium | Common |
|--------|------|--------|--------|
| $16.23 | $15.34 | $14.01 | $11.66[9] |

Of course it is possible that, despite the short market, small non-processing slaughterers might purchase live cattle at local markets at prices lower than those prevailing in the big cattle markets. The additional evidence which the Price Administrator submitted upon our reconsideration of the Heinz case, supra, seems to indicate that this was so for the period covered by that survey, which was after November 1, 1943. But respondent had not supplied us with a comparable survey for the period prior to November 1, 1943. In the present case the Price Administrator filed an application for leave to introduce evidence to support the validity of RMPR 169 as to non-processing slaughterers during the period prior to November 1, 1943. Though we granted such leave, the Price Administrator did not see fit to avail himself of it. On the evidence now before us, we feel compelled to conclude that, prior to the institution of the special subsidy, the maximum prices of RMPR 169 were inadequate for the non-processing slaughterers as a group. This conclusion is indeed implicit in the action of the Price Administrator and other responsible officials of the government who devised the cattle stabilization plan and the special subsidy for non-processing slaughterers for the avowed purpose of enabling the non-processing slaughterers to remain in business.

■ We do not say that RMPR 169 was invalid at the date of its issuance. Governmental price control cannot avoid a certain amount of trial and error. If the assumptions and forecasts upon which RMPR 169 was predicated had a rational basis, the Price Administrator was entitled to observe the actual results of the regulation in operation for a reasonable period of time before it could be said that he was arbitrary or capricious in not giving the regulation an overhauling. As we said in Ben H. Rosenthal & Co., Inc. v. Porter, supra, 158 F.2d at page 173: "It is possible, of course, that the maximum prices in a regulation initially valid may become invalid due to a significant shift of economic factors; and vice versa. In making a retrospective declaration as to the validity of a regulation as of some past date, this court should not view the case from the vantage point of hindsight. If, for example, a seller is charged with a criminal violation by an overceiling sale on December 15, 1943, and the question is whether the regulation

---

[9] These figures are taken from the Statement of Considerations accompanying the issuance of MPR 574—Live Bovine Animals (Cattle and Calves). See Pike & Fischer OPA Price Service, vol. 4, Food, p. 47,533.

was valid on that date, we have to project our thinking back to the economic situation as it existed on December 15, 1943, and to decide whether the Administrator then had, consistently with the statutory standards, a rational basis for maintaining the regulation in force in the light of information then available and of the reasonable forecast, as of that date, of the probable impact of the regulation in actual operation."

In a particular case it may be very difficult for us to determine the precise date on which a regulation, valid in its inception, became invalid due to subsequent developments. In the present case we are not faced with any such difficulty. It is clear enough that, by October 6, 1943, the date of the earliest violations by complainant charged in the pending enforcement suit, the Price Administrator had had more than a reasonable time to observe the results of RMPR 169 in actual operation. By that time the OPA was well aware that the theory and forecast upon which the maximum prices in the regulation had been predicated, had not been fulfilled and showed no likelihood of being fulfilled in the abnormal conditions then prevailing; and it was particularly apparent that the established maximum prices had put a disastrous squeeze upon the non-processing slaughterers as a group. See the testimony of Mr. Gilbert, Economic Adviser to the Price Administrator, quoted by us in the Armour case, supra, 148 F.2d at 532. In a memorandum to the Price Administrator from his Associate General Counsel, dated July 22, 1943, it was stated that the prices fixed by RMPR 169 "are resulting in a loss in beef operations for most of the industry"; and that the meat industry "is being violently and perhaps irreparably disrupted by present conditions. Many small slaughterers are being forced out of business." Further, the memorandum stated: "Seven months' experience with that Regulation has demonstrated that we cannot keep cattle prices at a proper level merely by controlling wholesale meat prices. Even as an abstract legal or economic proposition we can no longer reasonably assert that such a theory will work. Moreover, protests to the Regulation are now pending which should be acted upon immediately and which cannot, on the record, be denied. This issue is squarely raised and requires immediate decision in the discharge of the statutory duty of the Office."[10] At some time before October 6, 1943, the Price Administrator knew that corrective action was a pressing necessity. He knew .that something had to be done; the further delay was in determining what to do and in persuading other agencies of the government to cooperate in doing it. The final outcome, as we have seen, was the cattle stabilization plan and the special subsidy to non-processing slaughterers put into effect November 1, 1943.

A judgment will be entered declaring that the maximum prices prescribed by RMPR 169 were invalid as applied to complainant, Superior Packing Company, during the period October 6, 1943, to October 31, 1943, inclusive, and dismissing the complaint in all other respects.

---

[10] In a memorandum by the Chief Counsel, Beef, Small Meats and Fish Branch of the OPA, to the Associate General Counsel, dated October 12, 1943, it is stated: "It is clear from general data on cattle prices and the prices of meat and unprocessed byproducts, from analysis of the evidence submitted by protestants to the beef regulation, from reports of the enforcement staff in the field, and from discussion of members of the branch with numerous individual firms, that even the efficient beef slaughterer not engaged in the processing of edible byproducts can comply with RMPR 169 only by sustaining a serious loss. This class handles primarily cattle of commercial grade and better."