**WALTER BROWN & SONS, Inc. v. CLARK.**

Nos. 361, 362.

United States Emergency Court of Appeals.

Heard at Washington Sept. 2, 1947.
Decided Feb. 25, 1948.

436

Arthur J. Hilland, of Washington, D. C. (Hanserd K. Presley, of Washington, D. C., on the brief), for complainant.

Irving J. Helman, General Counsel, Liquidation Division, Department of Commerce, of Washington, D. C., (Tom C. Clark, Atty. Gen., and Floyd L. Cook, Charles G. Mulligan and Harry H. Schneider, Attys., Department of Justice, all of Washington, D. C., on the brief,) for respondent.

Before MARIS, Chief Judge, and MAGRUDER and McALLISTER, Judges.

MAGRUDER, Judge.

These two complaints, which were consolidated for hearing, involve the validity, as of certain past periods, of provisions of Revised Maximum Price Regulation No. 169 —Beef and Veal Carcasses and Wholesale Cuts (7 F.R. 10381), and Revised Maximum Price Regulation No. 239—Lamb and Mutton Carcasses and Cuts at Wholesale and Retail (7 F.R. 10688).

At the times here relevant, complainant was engaged in business in the District of Columbia as a non-processing slaughterer and wholesale dealer in lamb, veal, and edible by-products resulting from its own slaughter.

On June 28, 1943, two indictments were returned against complainant in the District Court of the United States for the District of Columbia. One indictment, in numerous counts, charged sales of foresaddles and hindsaddles of veal, during the period April 20–27, 1943, at prices in excess of those established by RMPR 169. The other indictment, in numerous counts, charged sales of hindsaddles of veal during the period January 7–February 12, 1943, at prices in excess of those established by RMPR 169, and sales of Kosher foresaddles of lamb and hindsaddles of lamb during the period December 24, 1942–February 12, 1943, at prices in excess of those established by RMPR 239. On May 29, 1946, complainant entered pleas of guilty to these indictments, and the District Court entered judgments imposing fines upon complainant. Thereafter, pursuant to § 204(e) of the Emergency Price Control Act, as amended, 50 U.S.C.A. Appendix § 924(e), complainant applied to the District Court, in each of the criminal cases, for leave to file a complaint in the Emergency Court of Appeals attacking the validity of the applicable provisions of RMPR 169 and RMPR 239. By order on June 26, 1946, the District Court granted such leave.

Respondent has urged that the complaints should be dismissed on the ground that the issues sought to be raised are res judicata as a result of our judgment of dismissal of an earlier complaint (No. 206) challenging the validity of these same regulations. Number 206 was ancillary to a civil complaint by the Price Administrator, filed in the District Court of the United States for the District of Columbia on November 18, 1943, seeking an injunction against Walter Brown & Sons, Inc., based on violations of

RMPR 169 and RMPR 239 alleged to have occurred during the period September–October, 1943. In that proceeding the District Court, on January 19, 1945, entered its final decree enjoining Walter Brown & Sons, Inc., from further violations. On the same day, Walter Brown & Sons, Inc., filed an application in the District Court under § 204(e) of the Price Control Act for leave to file a complaint in the Emergency Court of Appeals attacking the validity of the two regulations. Such leave was granted on February 1, 1945, and complaint No. 206 was thereafter duly filed in this court. During all this time the two criminal proceedings against complainant, above mentioned, were pending in the District Court.

Complainant moved in No. 206 for leave to introduce evidence. We granted this motion. Complainant obtained one extension of time, but did not come forward with the evidence within the extended time, nor seek another extension. On November 20, 1945, respondent moved to dismiss the complaint for failure to proceed. Complainant having failed to file an answer or objection to the motion to dismiss within the time permitted by our rules, this court, on November 29, 1945, entered judgment dismissing the complaint.

It is claimed by respondent that the issues raised in No. 206 were in substance the same as those presented in the pending complaints. This is certainly so as to the objections to the effect that the regulations on their face were void ab initio. The violations involved in No. 206 were for a later period of time than those involved in the instant litigation. As to this, respondent argues that the earlier 1943 period was necessarily subsumed in an adjudication of the validity of the regulations as of September–October, 1943, for complainant's basic attack in both proceedings went to the validity of the regulations ab initio, and if there were no curative changes by September, 1943, there were obviously none by the earlier periods; further, that the validity of the regulations, so far as the economic effect upon the industry was concerned, could not be tested on the basis of a short period of time but had to be examined in the light of the normal yearly period of livestock slaughtering operations with its seasonal variations and fluctuations.

■ But did our judgment of dismissal in No. 206 for failure to proceed operate as an adjudication upon the merits? Under § 204(c) of the Price Control Act, this court is empowered to "prescribe rules governing its procedure in such manner as to expedite the determination of cases of which it has jurisdiction under this Act." We have no rule expressly covering the matter. But our Rule 9(a), 50 U.S.C.A.Appendix, following section 924, provides: "Except as otherwise provided by law or by these rules the practice shall conform to that followed in a United States district court of three judges convened in the District of Columbia under the Act of October 22, 1913, c. 32, 38 Stat. 220 (28 U.S.C. 47 [28 U.S.C.A. § 47])." Since a district court sitting with three judges under the special provision of 28 U.S.C.A. § 47 is still a district court of the United States, the Federal Rules of Civil Procedure are applicable to it, and thus are incorporated by reference in, and have become a part of, our Rule 9. Rule 41(b), F.R.C.P., 28 U.S.C.A. following section 723c, provides: "For failure of the plaintiff to prosecute or to comply with these rules or any order of court, a defendant may move for dismissal of an action or of any claim against him. After the plaintiff has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction or for improper venue, operates as an adjudication upon the merits."

We are inclined to the view that respondent's point as to res judicata is well taken. However, since we recognize a margin of doubt about it, we prefer not to rest our decision solely upon this ground but to pass upon the merits of complainant's objections to the regulations.

■ Complainant makes a basic objection that the regulations are invalid within the meaning of the penal provisions of the Emergency Price Control Act, §§ 4(a) and 205(b), because each regulation recites on its face that it was issued "under the authority vested in the Price Administrator by the Emergency Price Control Act of 1942, as amended, and Executive Order No. 9250 [50 U.S.C.A.Appendix, § 901 note]". Section 2(a) of the Act authorized the Price Administrator by regulation or order to establish such maximum prices as in his judgment will be generally fair and equitable and will effectuate the purposes of the Act. Section 4(a) provides that it shall be unlawful to sell any commodity "in violation of any regulation or order under section 2". Section 205(b) provides that any person who willfully violates any provision of § 4 shall, upon conviction thereof, be subject to fine or imprisonment. To state the argument in complainant's words: "A regulation based in whole or in part on an executive order is not a valid regulation within the meaning of sections 4(a) and 205(b) of the act. It may be valid for other purposes but has no validity under those sections."

Of course, a price regulation may be perfectly valid, whether the authority to issue it is derived from one source or two; and it may be that the argument is one not properly addressed to us as falling within our exclusive jurisdiction to pass upon the validity of price regulations, but rather, is one that should be considered by the enforcement court as involving a question of interpretation of the penal provisions of the Price Control Act. But, passing that, it is pertinent to repeat what we said of another argument in Superior Packing Co. v. Clark, Em.App.1947, 164 F.2d 343, 348, "RMPR 169 has been before this court in many previous cases, in which competent counsel challenged the regulation on a variety of grounds, not, however, advancing this particular argument. * * * That, of course, does not disprove the soundness of the new argument; but it does suggest to us that the argument should be examined with a robust skepticism."

The argument is plainly without merit. Executive Order 9250 was issued under authority of the Act of October 2, 1942, now cited as the Stabilization Act of 1942, 56 Stat. 765, 50 U.S.C.A.Appendix, § 961 et seq., which authorized the President to issue general orders stabilizing prices, wages, and salaries affecting the cost of living, and gave him broad power to delegate his authority under the Act to such department, agency or officer as he might direct. By Title I of Executive Order 9250, the President delegated such general authority to the Office of Economic Stabilization, the Director of which was charged with the duty of formulating a comprehensive national economic policy with reference to prices, rents, wages, salaries, profits, rationing, subsidies, and all related matters, with a view to stabilizing the cost of living. To give effect to this comprehensive national economic policy, the Executive Order provided that the Director should have power to issue directives on policy to the federal departments and agencies concerned (including, of course, the Office of Price Administration); that the administration of activities related to such policy "shall remain with the departments and agencies now responsible for such activities, but such administration shall conform to the directives on policy issued by the Director." In other words, the Price Administrator in exercising his powers under the Price Control Act was to conform to directives on policy issued by the Director of the Office of Economic Stabilization. In Title IV of Executive Order 9250, the President himself issued certain general directives with reference to prices of agricultural commodities and commodities manufactured or processed therefrom, which became binding on the Price Administrator in the exercise of his powers of price control. If it be assumed that the authority of the Price Administrator to issue RMPR 169 and RMPR 239 was derived in part from Executive Order 9250, it would not follow that the penal provisions of the Price Control Act were inapplicable to violations of such regulations, for § 7(b) of the Act of October 2, 1942, under which Executive Order 9250 was issued, explicitly provided: "All provisions (including prohibitions and penalties) of the Emergency Price Control Act of 1942 which are appli-

cable with respect to orders or regulations under such Act shall, insofar as they are not inconsistent with the provisions of this Act, be applicable in the same manner and for the same purposes with respect to regulations or orders issued by the Price Administrator in the exercise of any functions which may be delegated to him under authority of this Act."

The Price Administrator, though he imposed price control upon meat at wholesale and retail, did not at the same time establish any maximum prices upon livestock, which constituted the slaughterers' biggest cost item. There were practical difficulties of administration which at that time persuaded the Price Administrator of the inadvisability of attempting to bring livestock prices under direct price control. See Armour & Co. v. Bowles, Em.App.1945, 148 F.2d 529, 531, certiorari denied 1945, 325 U.S. 871, 65 S.Ct. 1411, 89 L.Ed. 1989. But lack of livestock maximum prices would not of itself render invalid the maximum prices on meat if the latter permitted slaughterers a sufficient margin for profitable operation at prevailing livestock prices. Heinz et al. v. Bowles, Em.App., 149 F.2d 277, and, upon reconsideration, Em.App.1945, 150 F.2d 546; Ben H. Rosenthal & Co., Inc. v. Porter, Em.App.1946, 158 F.2d 171.

Complainant makes another objection, which is applicable to both regulations. It is argued that the regulations were invalid, in the periods now in question, because they treated all slaughterers on a uniform basis and failed to recognize, by special provision, the less favorable economic position of non-processing slaughterers of lambs and vealers as a group. In the Heinz case, supra, we said, 149 F.2d at page 281: "If the maximum prices in RMPR 169, in conjunction with the subsidy payments, do not make adequate provision for the non-processing slaughterers as a group, do not afford a sufficient margin for profitable operation by this the most numerous group in the industry, then the regulation is invalid as to the non-processing slaughterers, despite the fact that the regulation is, as we held in the Armour case, generally fair and equitable as applied to the processing slaughterers who constitute the greater part of the industry by volume of business." And we further expressed the view that Congress intended, not only that the regulations should be " 'generally fair and equitable,' " but that it should be "the duty of the Administrator under § 2(c) to avoid or eliminate manifest inequities in exceptional classes of cases so far as this might reasonably be done consistently with the main objective of the Act and with the effective administration of the stabilization program." However, complainant has not made a sufficient showing to come within this principle laid down in the Heinz case. We are unable to conclude that the Price Administrator was arbitrary and capricious in not providing differential treatment for the non-processing slaughterers, either at the dates on which RMPR 169 and RMPR 239 were issued, or during the periods now in question, which were in the early weeks after these regulations were issued. As of those past periods, it does not appear, from the facts then available or reasonable forecasts therefrom, that there was need to make special provision for this segment of the industry. As a matter of fact, after RMPR 169 had been in operation for several months, it became apparent from the trend of cattle prices that it was necessary to make special provision to relieve the hardship of the non-processing slaughterers of beef cattle; and a differential subsidy in favor of this group was therefore provided. See the Heinz case, supra, 149 F.2d at pages 280, 281; Superior Packing Co. v. Clark, supra, 164 F.2d at pages 351–353. This special subsidy applied to beef only. It was at no time considered necessary to make similar special provision for non-processing slaughterers of lambs or veal calves.

Apparently, complainant further contends that, even if the regulations be considered fair and equitable as applied to non-processing slaughterers as a group, still the Price Administrator should have made some special provision for complainant's unique situation. In its brief it describes itself as "in a separate class of the non-processing segment of the industry, doing a comparatively small specialized business in which it catered to a comparatively small special demand in widely scattered retail

markets"; and that therefore "complainant's situation ought to be contrasted to rather than compared with non-processing slaughterers generally." But "'considerations of administrative workability may render it impracticable to provide complete individualization of treatment.'" Ben H. Rosenthal & Co., Inc. v. Porter, supra, 158 F.2d at page 176. In any event, it could not be said that the Price Administrator acted arbitrarily or capriciously in failing to grant complainant an adjustment or other special relief under § 2(c) until the equities of complainant's unique situation were brought to his attention. Utah Junk Co. v. Fleming, Em.App.1946, 159 F.2d 440, 444, certiorari denied 1947, 330 U.S. 844, 67 S.Ct. 1084.

The remaining objections call for separate consideration of the two regulations.

In Counselman v. Fleming, Em. App.1947, 161 F.2d 203, certiorari denied 1947, 331 U.S. 861, 67 S.Ct. 1756, we summarized the history of price control with reference to veal. One group of violations of veal maximum prices to which the present complainant pleaded guilty took place in the period January 7–February 12, 1943, during which time RMPR 169 established maximum prices for veal on the "freeze" technique by reference to complainant's individual prices prevailing in a base period March 16–28, 1942. It happens that the period of violations now involved, January 7–February 12, 1943, is substantially the same as the period of violations in the Counselman case, supra; and we see no reason to depart from our conclusion in the Counselman case that the maximum veal prices established by RMPR 169 were valid during that period.

Another group of violations of veal maximum prices to which complainant pleaded guilty occurred in the period April 20–27, 1943. This period was just after the Price Administrator had issued Amendment 4 to RMPR 169 (8 F.R. 4097, effective April 3, 1943), which amendment abandoned the freeze type of price control of veal, and substituted specific dollars-and-cents ceiling prices, with differentials for various zones. RMPR 169 upon its original issuance on December 10, 1942, had established specific dollars-and-cents maximum prices for carcasses and wholesale cuts of beef, to correct certain defects and inequities which had become evident from experience under the earlier regulations utilizing the freeze technique. Incidentally, one of the objections which had been urged in the Counselman case was that it was arbitrary and capricious for the Price Administrator, while thus correcting inequities which had become apparent in MPR 169 as applied to beef, to fail to make a corresponding correction with reference to veal at the same time. Since difficulties with the structure of beef prices had presented the most urgent administrative problem, we held that it was entirely reasonable for the Price Administrator to set dollars-and-cents prices for beef as soon as he could, leaving to the future a similar action with reference to veal.

The proper adjustment of dollars-and-cents maximum prices in a regulation covering the whole of the United States was a task of great complexity, as is evident from a reading of the Price Administrator's careful and detailed Statement of Considerations accompanying the issuance of Amendment 4 to RMPR 169 (Pike & Fischer OPA Service, Vol. 4, Food, p. 46,-469). Necessarily the Price Administrator had to proceed upon a somewhat experimental basis. He was entitled to observe the actual results of the intricate price structure established by Amendment 4 for a reasonable period of time before it could be said that he was arbitrary or capricious in not making further adjustments and refinements. As we said in Ben H. Rosenthal & Co., Inc. v. Porter, supra, 158 F.2d at page 173: "In making a retrospective declaration as to the validity of a regulation as of some past date, this court should not view the case from the vantage point of hindsight. If, for example, a seller is charged with a criminal violation by an overceiling sale on December 15, 1943, and the question is whether the regulation was valid on that date, we have to project our thinking back to the economic situation as it existed on December 15, 1943, and to decide whether the Administrator then had, consistently with the statutory standards, a

rational basis for maintaining the regulation in force in the light of information then available and of the reasonable forecast, as of that date, of the probable impact of the regulation in actual operation." Judged by this standard, if this court had been called upon on April 27, 1943, to pass upon the validity of RMPR 169 with reference to veal prices, we could not then have held that the structure of prices established only three weeks earlier by Amendment 4, particularly the prices applicable to complainant's Zone 9, lacked a rational basis.

There remain to be considered certain objections to the maximum prices for lamb established by RMPR 239.

Section 1499.9(5) of the General Maximum Price Regulation (7 F.R. 3153, issued April 28, 1942), excepted mutton and lamb from the price control there established. Slaughterers of lambs were first brought under price control by Temporary Maximum Price Regulation No. 20 (7 F.R. 6002, effective August 10, 1942), which established maximum prices for each slaughterer on the basis of the highest prices he charged during the base period July 27–31, 1942. This was superseded on October 8, 1942, by MPR 239 (7 F.R. 8019), which continued in effect the freeze type of price control. On December 18, 1942, the Price Administrator issued RMPR 239 (7 F.R. 10688), which established dollars-and-cents maximum prices for lamb and mutton carcasses and wholesale cuts by grades on a zone basis, with provision for certain additional charges.

■ RMPR 239 did not impose maximum prices upon live lambs. But in his Statement of Considerations accompanying the issuance of RMPR 239 (Pike & Fischer OPA Service, vol. 4, Food, pp. 46,681, 46,-684), the Price Administrator expressed his conclusion that the prices established for lamb carcasses at wholesale "will permit an average price over the year of approximately $15 for the bulk of good lambs at Chicago." In fact the Price Administrator's prophecy as to the level of live lamb prices was pretty well fulfilled; the average price for good and choice lambs at Chicago for the entire year 1943 was a few cents

under $15 per cwt., and for 1944 even lower. However, complainant has challenged the Price Administrator's calculations by which he arrived at the conclusion that the maximum prices established by RMPR 239 for lamb carcasses at wholesale would permit slaughterers to obtain a reasonable margin of profit with an average price over the year of approximately $15 per cwt. for the bulk of good lambs at Chicago. The attack here relates chiefly to the Price Administrator's assumed figure of 47.25 per cent yield of carcass meat per cwt. of good and choice lambs; to the realizable value of the unprocessed by-products, of which the largest item is the pelt; and to the figures used for costs of slaughter, including an allowance for the normal profit margin. We have examined the figures and arguments relating to this matter, and state our conclusion that complainant has failed to sustain its burden of proof; in fact we are left with the conviction that the Price Administrator's calculations, as set forth in the Statement of Considerations, were fully warranted.

One further objection by complainant, with reference to RMPR 239, needs to be noted. It is said that whereas the Price Administrator based his calculations upon a yearly average price of approximately $15 for the bulk of good lambs at Chicago, the average prices of live lambs at Baltimore and Jersey City, which are the controlling markets in the area in which complainant operated, were much higher than the Chicago averages. This is true, as is amply shown by the statistics to which complainant refers. But the Price Administrator, in devising the dollars-and-cents price structure in RMPR 239, took account of this historic differential, and established for complainant's Zone 9 maximum prices for lamb carcasses $2.50 in excess of the corresponding maximum prices established for the zone which included Chicago. Complainant says that, for live lambs bought in Zone 9 and slaughtered locally, the favorable differential was only $1.00; but in this complainant is clearly mistaken. There was a basic differential of $1.50 for Zone 9 calculated to reflect roughly the dressed meat freight rates from the base zones to points in Zone 9. There was in addition

a $1.00 differential in complainant's portion of Zone 9 for locally slaughtered meat delivered within 75 miles of the point of slaughter. In the Statement of Considerations, the reason for this latter differential is explained as follows: In the eastern areas locally killed meat has always sold at a higher price than western dressed meat, buyers having been willing to pay this premium because of the fresher and brighter appearance, the smaller percentage of trimming and waste, and the longer period of time the retailer can hold the product without deterioration. The basic differential of $1.50 for Zone 9, corresponding with dressed meat freight rates, would not adequately compensate for the costs involved in transporting live animals east to slaughter. The chief factors in the higher costs of the eastern packer are the shrinkage in transit of the live animal as compared with dressed meat, with the consequent lower yield, and the higher freight rate when live animals are shipped as compared with the freight rate for the dressed product. It was calculated that a differential of $1.00 was about proper to cover such increased costs. For so much of Zone 9 as lay south of the Potomac River, where few lambs are shipped in for slaughter, the premium of $1.00 for locally dressed lamb was inapplicable; but complainant got the $1.00 premium because its plant was located north of that line.

Both the $1.50 basic differential, and the $1.00 premium for complainant's portion of Zone 9, were fixed differentials between the dollars-and-cents maximum prices in Zone 9 and in the base zones. They were applicable to complainant's sales of lamb carcasses and wholesale cuts whether the livestock slaughtered at complainant's plant were purchased locally or in the base zones.

■ Complainant has not undertaken to show that the established zone differentials were out of line with the historic differentials which prevailed in the industry prior to price control; and this does not appear to be the case. Upon the basis of the data available on December 18, 1942, when RMPR 239 was issued, it would appear that the zone differentials were reasonably and soundly constructed; and certainly the brief experience under the regulation from December 18, 1942, to February 12, 1943 (when the last of complainant's illegal sales of lamb occurred) did not indicate the necessity of revising upward the Zone 9 differentials. It must be remembered that the establishment of zone differentials substantially out of line with the historic pattern of the industry would be likely to have an unsettling effect upon established business practices of the industry with reference to production and distribution.[1]

Judgments will be entered dismissing the complaint in each of the consolidated cases.

[1] The following paragraphs from the Statement of Considerations accompanying the issuance of RMPR 239 are pertinent here:

"In setting specific prices, consideration has been given to the established business practices of the lamb industry, its methods of distribution and system of production in an effort to avoid changes upsetting to the industry and to assure a steady supply of meat.

"At the same time, variations in price had to be limited to the extent possible and tied down to definite standards if the Revised Regulation were to be made enforceable. All variations from the base prices, unless kept to the minimum which the facts would justify, involved the possibility of stimulating changes in methods of distribution and production. Furthermore, each such variation increases the difficulties of enforcement by facilitating concealment of an unwarrantedly high price under cover of one of the recognized differentials. For the good of the industry, the possibilities of successful violation had to be held to a minimum. A regulation too easily violated places the dishonest seller at a competitive advantage which pushes the entire industry into the position of law breakers—and stabilization of prices becomes impossible. Revised Maximum Price Regulation No. 239 represents a reconciliation, to the extent possible, of these two somewhat conflicting goals. Only experience under the Revised Regulation can show to what extent this reconciliation has been successful. Upon the basis of such experience any further necessary action will be taken."